Faith J. MYERS, Appellant,

v.

ALASKA PSYCHIATRIC INSTITUTE,
Appellee.

No. S–11021.

Supreme Court of Alaska.

June 30, 2006.

James B. Gottstein, Law Project for Psychiatric Rights, Inc., Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Faith Myers, after being involuntarily committed to the Alaska Psychiatric Institute, appealed a superior court order approving nonconsensual administration of psychotropic drugs by the institute. She argues that the statutes relied on by the court in approving the medication violate the Alaska Constitution's guarantees of privacy and liberty. We agree. In keeping with most state courts that have addressed the issue, we hold

that, in the absence of emergency, a court may not authorize the state to administer psychotropic drugs to a non-consenting mental patient unless the court determines that the medication is in the best interests of the patient and that no less intrusive alternative treatment is available.

## II. FACTS AND PROCEEDINGS

Faith Myers has suffered with mental illness for over twenty years. Her symptoms have included paranoia, dizziness, and vivid hallucinations. She has been hospitalized on a number of occasions and, at times, a regimen of psychotropic medication has seemed to improve her condition.

In 2001 Myers weaned herself off of psychotropic medication, believing that the drugs actually worsened her condition. She has described herself from this time forward as an advocate for the mentally ill.

In February 2003, as a result of concerns expressed by Myers's daughter and neighbors, Myers was involuntarily committed to the Alaska Psychiatric Institute (API). Once admitted, Myers refused to discuss treatment options with institute doctors. API then filed a petition with the superior court requesting authorization to medicate Myers without her consent.

Myers responded by challenging the constitutionality of the statutory scheme that authorizes facilities to administer psychotropic drugs without first securing a patient's consent. She argued that Alaska's constitutional rights to liberty and privacy guarantee her the "right to be free from unwanted mind-altering chemicals." She asserted that the state can abridge this right only when necessary to advance a compelling state interest. In her case, Myers believed that API had "not come close" to making this requisite showing and had also failed to show that involuntary medication was a "[least] restrictive means" of advancing any state interest.

Myers also challenged "the [statutory] limitation on a court's authority to modify or restrict a treatment plan." The statute authorizing court-ordered administration of psychotropic medication provides that once a court "determines that [a] patient is not com-

petent to provide informed consent," the court "*shall* approve the . . . proposed use of psychotropic[s]."[1] On its face, this provision does not seem to allow the court to consider whether the proposed treatment plan would actually be in the patient's best interest, leaving that decision completely to the treating facility's physicians.

During Myers's hearing on API's petition, two institute psychiatrists testified that, in their opinion, administering psychotropic medication to Myers would be appropriate. Myers countered with testimony from two expert psychiatrists who "forcefully present[ed] their differing views on the advisability of administering [psychotropic] medications to patients suffering from schizophrenia." The first testified that psychotropic medication is not the only viable treatment for schizophrenia. While acknowledging that psychotropic medications played an accepted role in the "standard of care for [the] treatment of psychosis," he advised that, because such drugs "have so many problems," they should be used "in as small a dose for as short a period of time as possible." Myers's second expert offered more specific testimony that one of the drugs that API proposed to administer to Myers—Zyprexa—was, despite being "widely prescribed," a "very dangerous" drug of "dubious efficacy." He based this testimony on a "methodological analysis" of the studies that led the food and drug administration to approve Zyprexa for clinical use.

At the conclusion of the hearing, the superior court found that Myers "lacked . . . insight into her own condition" and did "not appreciate that she suffers from a mental disorder." Although it noted that Myers understood the debate about the advisability of psychotropic medication and had articulated a "reasonable objection to the proposed medication," the court nonetheless ruled that she lacked the capacity to make informed decisions regarding her treatment. Construing Alaska's statutes as not allowing it to make an independent determination of Myers's best interests, the court did not consider Myers's expert evidence on the point and authorized API to administer psychotropic medications to Myers based on API's own assessment of Myers's best interests.

The court nevertheless noted that it found Myers's case "troubling"—so much so that it issued an additional order addressing in detail the arguments presented in the parties' pre-hearing briefs. In the order, the court found it troubling that Alaska's statutory scheme prevented it from considering the merits of API's treatment plan, or weighing the objections of Myers's experts. Because it believed that the statute unambiguously limited the superior court's role "to deciding whether Ms. Myers has sufficient capacity to give informed consent," the court felt constrained to adhere to its literal meaning. Yet the court nevertheless emphasized that it found this limitation to be problematic:

> Where a patient, such as Ms. Myers, has a history of undergoing a medical treatment she found to be harmful, where she is found to lack capacity to make her own medical decisions and a valid debate exists in the medical/psychiatric community as to the safety and effectiveness of the proposed treatment plan, it is troubling that the statutory scheme apparently does not provide a mechanism for presenting scientific evidence challenging the proposed treatment plan.

Myers now appeals.

## III. DISCUSSION

Echoing the superior court's concern, Myers contends that Alaska's statutory scheme violates her constitutional rights to liberty[2] and privacy.[3] The central question she raises is whether the state may force an unwilling mental patient to be treated with psychotropic drugs without first obtaining a judicial determination that this treatment is in the patient's best interests and that no less intrusive course of treatment is available.

Myers argues that the right to refuse forced medication is fundamental and that API cannot abridge this right without first

---

**1.** AS 47.30.839(g) (emphasis added).

**2.** Alaska Const. art. I, § 7.

**3.** Alaska Const. art. I, § 22.

showing that medication would advance a compelling state interest and that no less intrusive alternative is available. She further contends that our state's constitutional liberty and privacy guarantees require that courts authorizing the administration of psychotropic medications must find, first, that the requested course of medication is in the patient's best interests; and, second, that the patient would presently consent to the treatment if capable of making an informed decision.

In response, API initially contends that this appeal should be dismissed as moot because Myers was released from API soon after the superior court issued its ruling, so she never actually received the authorized course of treatment. As to the merits of Myers's constitutional claim, API denies that Myers's interest in refusing unwanted psychotropic medication is fundamental. Because Myers has been judged unable to make informed decisions about her mental health condition, API analogizes her status to the status of minors, who, API claims, generally receive "a different level of constitutional protection." Therefore, API argues, in order to justify medicating Myers without her consent, the state needs only to show that this treatment would advance something "less than a compelling state interest." API further contends that, "as a committed mental patient," Myers "has a competing constitutional interest in receiving treatment for her illness." [4] It asserts that the state's "duty to provide [Myers] with treatment" amounts to a legitimate state interest—one that we should deem sufficient to overcome Myers's objections.

## A. Alaska's Current Statutory Provisions

To place these arguments in perspective, we must begin by considering Alaska's statutory provisions governing treatment of mental patients. Alaska law recognizes and addresses a distinct class of drugs called "psychotropic medications." [5] Psychotropic drugs "affect the mind, behavior, intellectual functions, perception, moods, and emotions" [6] and are known to cause a number of potentially devastating side effects.[7]

> [M]ost common ... are the temporary, muscular side effects (extra-pyramidal symptoms) which disappear when the drug is terminated; dystonic reactions (muscle spasms, especially in the eyes, neck, face, and arms; irregular flexing, writhing or grimacing movements; protrusion of the tongue); [and] akathesia (inability to stay still, restlessness, agitation) ... Additionally, there are numerous other nonmuscular effects, including drowsiness, weakness, weight gain, dizziness, fainting, low blood pressure, dry mouth, blurred vision, loss of sexual desire, frigidity, apathy, depression, constipation, diarrhea, and changes in the blood.[8]

Courts have observed that "the likelihood [that psychotropic drugs will cause] at least some temporary side effects appears to be undisputed" [9] and many have noted that the drugs may—most infamously—cause Parkinsonian syndrome and tardive dyskinesia.[10] Parkinsonian syndrome consists of "muscular rigidity, fine resting tremors, a masklike face, salivation, motor retardation, a shuffling gait, and pill-rolling hand movements." [11] Tardive dyskinesia involves "slow, rhythmical, repetitive, involuntary movements of the mouth, lips, and tongue"; [12] it is perma-

---

4. *Cf. Rust v. State,* 582 P.2d 134, 138–40 (Alaska 1978).

5. *See* AS 47.30.836; AS 47.30.838.

6. *Steele v. Hamilton County Cmty. Mental Health Bd.,* 90 Ohio St.3d 176, 736 N.E.2d 10, 15 n. 3 (2000) (internal citations omitted).

7. API did not dispute that psychotropic medication can cause potentially severe side effects.

8. *Jarvis v. Levine,* 418 N.W.2d 139, 145 (Minn. 1988) (quoting Earl Plotkin, *Limiting the Thera-*

*peutic Orgy: Mental Patients' Right to Refuse Treatment,* 72 Nw. U.L.Rev. 461, 475–76 (1977)).

9. *Jarvis,* 418 N.W.2d at 145.

10. *Steele,* 736 N.E.2d at 17 (quoting Bruce J. Winick, The Right to Refuse Mental Health Treatment 72–73 (1997)).

11. *Id.* (quoting Winick, The Right to Refuse Mental Health Treatment 72–73 (1997)).

12. *Id.* (quoting Winick, The Right to Refuse Mental Health Treatment 72–73 (1997)).

nent, and its symptoms cannot currently be treated.[13]

Side effects aside, the truly intrusive nature of psychotropic drugs may be best understood by appreciating that they are literally intended to alter the mind.[14] Recognizing that purpose, many states have equated the intrusiveness of psychotropic medication with the intrusiveness of electroconvulsive therapy and psychosurgery.[15]

A special statutory regime governs involuntary administration of these highly intrusive medications.[16] It allows the state to administer psychotropic medication without obtaining a patient's consent in both crisis and non-crisis situations.[17] This case involves only the latter, and we emphasize at the outset that our opinion does not extend to the use of psychotropic medication in crisis or emergency situations.

Under Alaska law, to administer psychotropic drugs in a non-crisis situation without first obtaining the patient's consent, the state must follow a two-step judicial process. The first step requires the state to petition for the person's commitment to a treatment facility.[18] Persons may be involuntary committed in Alaska if the state can show by clear and convincing evidence that they are either mentally ill and, as a result, likely to cause harm to themselves or others, or are "gravely disabled." [19] Persons are deemed "gravely disabled" when they are so unable to care for themselves that it seems very likely that they will come to serious harm without help.[20] To commit a mentally ill person for more than seventy-two hours there must be, in addition, a signed statement by two mental health professionals declaring that treatment staff have considered and dismissed less restrictive alternatives, and that they believe that the proposed course of treatment (including involuntary commitment) will improve the person's condition.[21]

An order authorizing a person's involuntary commitment does not authorize the state to treat the committed person with psychotropic drugs. Nor does it amount to a finding that the patient is incapable of giving or withholding informed consent to submit to such treatment.[22] To treat an unwilling and

**13.** *Id.* (quoting WINICK, THE RIGHT TO REFUSE MENTAL HEALTH TREATMENT 72–73 (1997)).

**14.** *Riggins v. Nevada,* 504 U.S. 127, 134, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) ("The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes.").

**15.** *See, e.g., Jarvis,* 418 N.W.2d at 146; *In re K.K.B.,* 609 P.2d 747, 749 (Okla.1980) ("[W]e deal today only with consent to so called 'organic therapy' which can change a patient's behavior without his cooperation such as electroshock, psychosurgery and, as in the instant case, the use of anti-psychotic drugs. These treatments are intrusive in nature and an invasion of the body.") (internal citations omitted).

**16.** *See* AS 47.30.836, "Psychotropic medication in nonemergency," and AS 47.30.838, "Psychotropic medication in emergencies."

**17.** *Id.* AS 47.30.839 sets out the procedures for obtaining a court order for the forcible administration of psychotropic medication in both emergency and non-emergency situations.

**18.** *See* AS 47.30.700–.815 for procedures governing involuntary admission of mental patients for treatment.

**19.** *See* AS 47.30.735(c); AS 47.30.725(b).

**20.** AS 47.30.915(7) defines "gravely disabled" to mean "a condition in which a person as a result of mental illness"

(A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently.

**21.** AS 47.30.730(a)(2) & (3).

**22.** Other state courts have noted the "nearly unanimous modern trend in the courts, and among psychiatric and legal commentators" that "there is no significant relationship between the need for hospitalization of mentally ill patients and their ability to make treatment decisions." *Rivers v. Katz,* 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337, 342 (N.Y.1986); *see also Rogers v. Comm'r of the Dep't of Mental Health,* 390 Mass. 489, 458 N.E.2d 308, 314 (1983) ("involuntarily committed patients are competent until

involuntarily committed mental patient with psychotropic medication, the state must initiate the second step of the process by filing a second petition, asking the court to approve the treatment it proposes to give. At this second stage, the state must prove two propositions by clear and convincing evidence: (1) that the committed patient is currently unable to give or withhold informed consent regarding an appropriate course of treatment;[23] (2) that the patient never previously made a statement while competent that reliably expressed a desire to refuse future treatment with psychotropic medication.[24]

In order to make informed decisions possible, the law requires treatment facilities to give their patients certain information concerning their situation and need for treatment, including advice about: their diagnosis; proposed medications, including possible side effects and interactions with other drugs; their medical history; alternative treatments; and a statement describing their right to give or withhold consent.[25]

For non-emergencies, the standard for determining the patient's capacity to give informed consent is laid out in AS 47.30.837(c).[26] This provision allows a patient to refuse medication unless the state shows, by clear and convincing evidence, that the patient cannot demonstrate the capacity to understand the patient's situation and assimilate relevant facts, is unable to participate in treatment decisions, or is unable to articulate any objections to the proposed medication.[27] Under this provision, a patient's inability to appreciate the presence of a mental disorder is a relevant consideration but is not dispositive.[28]

When the state files its petition to authorize psychotropic medication, the law requires a "visitor" to be appointed to assist the court when it considers the petition. The visitor has a duty to gather and provide information to the court on two issues: first, the visitor must evaluate the patient's present condition by administering a "capacity assessment"; second, the visitor must conduct a search for

adjudicated incompetent"); *Davis v. Hubbard,* 506 F.Supp. 915, 935 (N.D.Ohio 1980) (there is no "necessary relationship" between mental illness and the ability to give informed consent).

23. *See* AS 47.30.836(3); AS 47.30.839(g).

24. *See* AS 47.30.839(g).

25. AS 47.30.837(d)(2) provides:
"informed" means that the evaluation facility or designated treatment facility has given the patient all information that is material to the patient's decision to give or withhold consent, including
(A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
(B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;
(C) a review of the patient's history, including medication history and previous side effects from medication;
(D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol;
(E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment; and
(F) a statement describing the patient's right to give or withhold consent to the administration of psychotropic medications in nonemer-

gency situations, the procedure for withdrawing consent, and notification that a court may override the patient's refusal[.]

26. AS 47.30.837 provides, in relevant part:
(c) ... If the facility has reason to believe that the patient is not competent to make medical or mental health treatment decisions and the facility wishes to administer psychotropic medication to the patient, the facility shall follow procedures of AS 47.30.839.
(d) In this section,
(1) "competent" means that the patient
(A) has the capacity to assimilate relevant facts and to appreciate and understand the patient's situation with regard to those facts, including the information described in (2) of this subsection;
(B) appreciates that the patient has a mental disorder or impairment, if the evidence so indicates; denial of a significantly disabling disorder or impairment, when faced with substantial evidence of its existence, constitutes evidence that the patient lacks the capability to make mental health treatment decisions;
(C) has the capacity to participate in treatment decisions by means of a rational thought process; and
(D) is able to articulate reasonable objections to using the offered medication[.]

27. *See also* AS 47.30.839(g); AS 47.30.825(c).

28. AS 47.30.837(d)(1)(B).

any prior "expressed wishes of the patient regarding medication." [29] The search for prior expressions regarding medications includes both written and oral statements:

The visitor shall gather pertinent information and present it to the court in written or oral form at the hearing. The information must include documentation of the following:

(1) the patient's responses to a capacity assessment instrument administered at the request of the visitor;

(2) any expressed wishes of the patient regarding medication, including wishes that may have been expressed in a power of attorney, a living will, an advance health care directive under AS 13.52, or oral statements of the patient, including conversations with relatives and friends that are significant persons in the patient's life as those conversations are remembered by the relatives and friends; oral statements of the patient should be accompanied by a description of the circumstances under which the patient made the statements, when possible. [30]

Before authorizing psychotropic treatment, the court must hold a hearing and consider all relevant evidence presented by the petitioner, the respondent, and the visitor. [31] At the end of the hearing, the court may not authorize nonconsensual psychotropic medication if it finds that the patient is presently competent; in such cases, the court must honor the unwilling patient's wishes:

If the court determines that the patient is competent to provide informed consent, the court shall order the facility to honor the patient's decision about the use of psychotropic medication. [32]

But if the court finds that the patient is presently incapable of giving or withholding informed consent, *and* further determines that the patient was also incompetent at the time of any previously expressed wishes not

to be medicated, then the statute directs that the court *"shall"* authorize treatment:

If the court determines that the patient is not competent to provide informed consent and, by clear and convincing evidence, was not competent to provide informed consent at the time of previously expressed wishes documented under [the visitor's report], the court shall approve the facility's proposed use of psychotropic medication. [33]

In short, once the court finds that the patient is presently incapable of consenting and has never before expressed medication-related wishes while competent, these provisions leave the court no discretion to consider a patient's best interests: the provisions require it to approve the treatment.

## B. Mootness

■ Soon after the superior court authorized API to administer treatment, Myers was released. Because no psychotropic medications were ever administered to her without her consent, API argues that Myers's claims are now moot.

■ We generally "refrain from deciding issues 'where the facts have rendered the legal issues moot.' " [34] But we do not enforce this rule rigidly, and have recognized that an exception applies when a potentially moot case raises a matter "of grave public concern" that is "recurrent" but "capable of evading review." [35]

Here, API acknowledges that medication orders are "time critical," and that it is doubtful that an appeal from a medication order could ever be completed within the order's period of effectiveness. Nonetheless, API maintains that because this case is the first challenge to the relevant statutes in eleven years, it is unlikely that this controversy will actually recur. API urges us to consider the issue's limited "track record of

29. AS 47.30.839(d).

30. *Id.*

31. *See* AS 47.30.839(e).

32. AS 47.30.839(f).

33. AS 47.30.839(g).

34. *Hayes v. Charney,* 693 P.2d 831, 834 (Alaska 1985) (quoting *Doe v. State,* 487 P.2d 47, 53 (Alaska 1971)).

35. *Id.* (quoting *Doe,* 487 P.2d at 53).

repetition" and to find that the public interest exception does not apply to this case.

We have found the public interest exception to apply in analogous settings. We have held, for example, that the preadjudication detention of children is a matter of public concern that was likely to recur.[36] We similarly applied the exception to a prisoner who challenged an order imposing solitary confinement, even though the solitary time had already been served.[37]

The United States Supreme Court has applied the public interest exception in a case involving facts similar to those of Myers's case. In *Washington v. Harper*, the Court considered a mentally ill prisoner's claim challenging the state's efforts to medicate him with antipsychotic drugs, even though the state had abandoned its efforts.[38] The Court declined to find the issue moot, noting that the prisoner was still jailed, he still suffered from schizophrenia, and the controversy could recur.[39]

Given the importance of the issues Myers raises, their likelihood of recurring, and their ability to evade timely appellate review, we similarly hold that the public interest exception applies to this case.

### C. Myers's Constitutional Challenge

■ Myers argues that, as interpreted in the superior court's order, the provisions governing authorization of treatment with psychotropic medications violate the Alaska Constitution's guarantees of liberty and privacy. We agree.

The Alaska Constitution's opening provision, article I, section 1, declares, "This con-

stitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry."[40] Article I then sets out more specific provisions guaranteeing individual liberty and privacy in sections 7 and 22. Section 7 addresses liberty: "No person shall be deprived of life, liberty, or property, without due process of law."[41] Section 22 guarantees privacy: "The right of the people to privacy is recognized and shall not be infringed."[42]

■ Although the federal constitution sets the minimum protections afforded to individual liberty and privacy interests, the Alaska Constitution often provides more protection.[43] We have specifically recognized that Alaska's guarantee of privacy is broader than the federal constitution's:

> Since the citizens of Alaska, with their strong emphasis on individual liberty, enacted an amendment to the Alaska Constitution expressly providing for a right to privacy not found in the United States Constitution, it can only be concluded that the right is broader in scope than that of the Federal Constitution.[44]

We have similarly declared Alaska's constitutional guarantee of individual liberty to be more protective.[45]

■ We determine the boundaries of individual rights guaranteed under the Alaska Constitution by balancing the importance of the right at issue against the state's interest in imposing the disputed limitation.[46] When a law places substantial burdens on the exercise of a fundamental right, we require the

---

36. *See Doe,* 487 P.2d at 53.

37. *Brandon v. Dep't of Corr.,* 865 P.2d 87, 92 n. 6 (Alaska 1993).

38. *Washington v. Harper,* 494 U.S. 210, 218–19, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

39. *Id.* at 219, 110 S.Ct. 1028; *see also State ex. rel. Jones v. Gerhardstein,* 141 Wis.2d 710, 416 N.W.2d 883, 888 (1987).

40. Alaska Const. art. I, § 1.

41. Alaska Const. art. I, § 7.

42. Alaska Const. art. I, § 22.

43. *See, e.g., Valley Hosp. Ass'n v. Mat–Su Coalition,* 948 P.2d 963, 966–67 (Alaska 1997).

44. *Anchorage Police Dep't Employees Ass'n v. Municipality of Anchorage,* 24 P.3d 547, 550 (Alaska 2001) (quoting *Ravin v. State,* 537 P.2d 494, 514–15 (Alaska 1975) (Boochever, J., and Connor, J., concurring)).

45. *See, e.g., Breese v. Smith,* 501 P.2d 159, 170 (Alaska 1972).

46. *See, e.g., Sampson v. State,* 31 P.3d 88, 91 (Alaska 2001).

state to "articulate a compelling [state] interest" [47] and to demonstrate "the absence of a less restrictive means to advance [that] interest." [48] But when the law "interferes with an individual's freedom in an area that is not characterized as fundamental," we require the state to "show a legitimate interest and a close and substantial relationship between its interest and its chosen means of advancing that interest." [49]

### 1. Importance of right to choose or reject medication

In the past we have recognized that Alaska's constitutional rights of privacy and liberty encompass the prerogative to control aspects of one's personal appearance, [50] privacy in the home, [51] and reproductive rights. [52] We have noted that "few things [are] more personal than one's own body," [53] and we have held that Alaska's constitutional right to privacy "clearly . . . shields the ingestion of food, beverages or other substances." [54]

Because psychotropic medication can have profound and lasting negative effects on a patient's mind and body, we now similarly hold that Alaska's statutory provisions permitting nonconsensual treatment with psychotropic medications implicate fundamental liberty and privacy interests. [55]

We are hardly the first court to reach this conclusion. A number of state supreme courts have declared that the right to refuse psychotropic medication is fundamental; we find their opinions to be both instructive and persuasive. [56]

In *Rogers v. Commissioner of the Department of Mental Health*, the Supreme Judicial Court of Massachusetts held that a committed mental patient could not be forcibly medicated with antipsychotic drugs unless a court determined both that he was incompetent and that he would have consented to the administration of the drugs if he was competent. [57] Although the court's opinion relied on

47. *Ranney v. Whitewater Eng'g*, 122 P.3d 214, 222 (Alaska 2005).

48. *Sampson*, 31 P.3d at 91.

49. *Ranney*, 122 P.3d at 222 (quoting *Sampson*, 31 P.3d at 91).

50. *See Breese*, 501 P.2d at 170.

51. *See Ravin*, 537 P.2d at 500, 502–03.

52. *See Valley Hosp. Ass'n*, 948 P.2d at 969.

53. *Breese*, 501 P.2d at 169; *but see Sampson*, 31 P.3d at 92 (holding that the constitutional right to control one's own body does not create a constitutional right to assisted suicide).

54. *Gray v. State*, 525 P.2d 524, 528 (Alaska 1974).

55. The issue before us is a constitutional question to which we apply our independent judgment. Constitutional provisions, we have held, "should be given a reasonable and practical interpretation in accordance with common sense." *Arco Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992) (citing *Kochutin v. State*, 739 P.2d 170, 171 (Alaska 1987)).

56. In addressing the importance of a committed patient's right to choose or refuse psychotropic medications, API's briefing relies heavily on United States Supreme Court cases dealing with the forced medication of mentally ill prisoners. *See Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (defendant await-

ing federal criminal trial); *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (defendant awaiting state criminal trial); *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (convicted state prisoner). In contrast to the state cases we rely on, which deal with civilly committed patients, the federal cases cited by API have little value here because prisoners' rights differ markedly from the rights of civilly committed mental patients. The prisoners involved in most of those cases had greatly diminished liberty interests because they had been convicted and incarcerated for criminal offenses, not because they were mentally ill. Further, in all of those prisoner cases—even *Sell v. United States*, which involved a mentally ill prisoner awaiting trial—the extraordinary security risks inherent in managing incarcerated criminal defendants greatly increased the strength of the government's administrative and institutional interests in providing mentally ill prisoners with medical treatment. *Cf. In re Qawi*, 32 Cal.4th 1, 7 Cal.Rptr.3d 780, 81 P.3d 224, 232 (2004) (even competent prison inmate can be forcibly medicated if he is a danger to himself and others and treatment is in his best medical interest). Here, API has never asserted that Myers posed an imminent threat of danger to any of API's patients or staff, and it has never suggested that its institutional or administrative interests compelled it to treat her with psychotropic drugs.

57. *Rogers v. Commissioner of Dep't of Mental Health*, 390 Mass. 489, 458 N.E.2d 308, 311 (1983).

Massachusetts's statutory and common law, rather than on interpretation of the state constitution, the court emphasized the "constitutional and common law origins" of "[e]very competent adult['s] . . . right 'to [forgo] treatment, or even cure, if it entails what for him are intolerable consequences or risks however unwise his sense of values may be in the eyes of the medical profession.'"[58] The court further emphasized that mentally ill patients have dignity and worth equal to other individuals; on this basis, the court held that a committed mental patient is entitled to an independent judicial determination of whether the patient would have consented to treatment with psychotropic drugs.[59] And the court explicitly rejected the argument that a "substituted judgment determination" of this kind could safely be left to the treating doctors rather than the courts.[60]

In *Rivers v. Katz*, the New York Court of Appeals similarly located a person's right to control his medical treatment in state common law but went on to declare that "[t]his fundamental common-law right is coextensive with the patient's liberty interest protected by the due process clause of our State Constitution."[61] It wrote,

> In our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure that the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires[.][62]

While acknowledging the state's police power to forcibly medicate mental patients in emergency situations—a situation not at issue in the case before us—the court held that in New York, decisions to forcibly medicate persons in all other circumstances must be made by the courts.[63] If "the court concludes that the patient lacks the capacity to determine the course of his own treatment, the court must [then] determine whether the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest, taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments."[64]

The Minnesota Supreme Court reached a similar result in *Jarvis v. Levine*.[65] It held that Minnesota's constitutional guarantee of privacy "begins with protecting the integrity of one's own body and includes the right not to have it altered or invaded without consent. Commitment to an institution does not eliminate this right. When intrusive treatment is proposed, the 'professional judgment' of medical personnel insufficiently protects this basic human right."[66] Thus, in Minnesota, the forcible medication of a committed mental patient requires both a judicial finding of incapacity to give informed consent and a judicial "hearing to determine the necessity and reasonableness of the treatment."[67]

Most recently, the Ohio Supreme Court held in *Steele v. Hamilton County Community Mental Health Board* that the state could forcibly medicate a mental patient under its *parens patriae* authority only after a

**58.** *Id.* at 310, 314 (quoting *Harnish v. Children's Hosp. Med. Ctr.*, 387 Mass. 152, 439 N.E.2d 240, 242 (1982) (internal citations omitted)).

**59.** *Id.* at 315 ("To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons.").

**60.** *See id.* at 317.

**61.** *Rivers v. Katz*, 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337, 341 (1986) ("It is a firmly established principle of the common law of New York that every individual 'of adult years and

sound mind has a right to determine what shall be done with his own body' and to control the course of his medical treatment.") (internal citations omitted).

**62.** *Id.*

**63.** *Id.* at 343–44.

**64.** *Id.* at 344.

**65.** *Jarvis v. Levine*, 418 N.W.2d 139 (Minn.1988).

**66.** *Id.* at 148.

**67.** *Id.* at 148 n. 7.

court had found, "by clear and convincing evidence, that (1) the patient does not have the capacity to give or withhold informed consent regarding his/her treatment, (2) it is in the patient's best interest to take the medication, *i.e.*, the benefits of the medication outweigh the side effects, and (3) no less intrusive treatment will be as effective in treating the mental illness." [68] Ruling that the "right to refuse medical treatment is a fundamental right in our country, where personal security, bodily integrity, and autonomy are cherished liberties," the court emphasized that "[t]hese liberties were not created by statute or case law ... [r]ather, they are rights inherent in every individual" that find explicit protection under the Ohio Constitution.[69]

Given the nature and potentially devastating impact of psychotropic medications [70]—as well as the broad scope of the Alaska Constitution's liberty and privacy guarantees—we now similarly hold that the right to refuse to take psychotropic drugs is fundamental; and we further hold that this right must extend "equally to mentally ill persons," so that the mentally ill are not treated "as persons of lesser status or dignity because of their illness." [71]

When no emergency exists, then, the state may override a mental patient's right to refuse psychotropic medication only when necessary to advance a compelling state interest and only if no less intrusive alternative exists.[72]

## 2. Importance of countervailing state interests

API argues that medicating Myers would serve two compelling state interests: it

would prevent Myers from harming herself or others, and would ameliorate Myers's condition. These interests, API argues, find legitimate sources in two traditional state powers: the state's police power and its *parens patriae* duty.[73]

### a. Police power

API argues that the state's police power is implicated here because the superior court found that Myers was a danger to herself and others. Just as citizens have a right to some protection from the state, API argues, the state has a legitimate and compelling interest in the physical safety of its citizens. In API's view, this interest is "sufficient to overcome a patient's right to refuse psychotropic medication."

In an emergency situation, API might be correct. Indeed, the Supreme Court of Ohio has so held, ruling that the police power can justify medication when the state perceives an "imminent threat of harm." [74] But that is not the situation here. As already mentioned, this case centers on the use of psychotropic medication in non-emergency situations.[75] And API has not maintained that Myers posed an imminent threat of harm to herself or anyone else after she was committed for treatment at API. In these circumstances, the state's power of civil commitment sufficed to meet its police-power interest, so we fail to see how the issue of medication implicates the state's police power at all:

If there is no emergency, hospital personnel are in no danger; the only purpose of

---

68. *Steele v. Hamilton County Cmty. Mental Health Bd.*, 90 Ohio St.3d 176, 736 N.E.2d 10, 21 (2000).

69. *Id.* at 15.

70. See above, part III.A.

71. *Rivers*, 504 N.Y.S.2d 74, 495 N.E.2d at 341; *see also Rogers*, 458 N.E.2d at 315 ("To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons.").

72. *Cf. Valley Hosp. Ass'n*, 948 P.2d at 969.

73. API's brief actually claims three interests; but one of the them—the state's duty to provide treatment to committed mental patients, established in *Rust v. State*, 582 P.2d 134 (Alaska 1978)—derives from the state's *parens patriae* authority, *id.* at 139–40, so we treat the two claimed interests as one.

74. *Steele*, 736 N.E.2d at 18 (holding this to be the "only" situation in which the police power can serve as a compelling justification).

75. *See* AS 47.30.839(a)(2).

forcible medication in these circumstances would be to help the patient.. But the basic premise of the right to privacy is the freedom to decide whether we prefer to be helped, or to be left alone.[76]

Indeed, it seems noteworthy that the statutory provision that governs petitions to administer psychotropics in non-emergency situations makes no mention of the police power, and does not require a treatment facility to make any showing of institutional risk or danger to others as a condition for authorizing treatment.[77] The applicable statutes allow medication to be authorized without any finding—judicial or medical—that the patient poses a danger.[78]

The state's police power—its power to protect others from Myers—thus provides no justification, compelling or otherwise, for API to override Myers's choice to accept or refuse psychotropic medication.

### b. Parens patriae

API proposes a second compelling interest: the state's *parens patriae* obligation—its duty to protect Myers from herself. The doctrine of *parens patriae* refers to the inherent power and authority of the state to protect "the person and property" of an individual who "lack[s] legal age or capacity." [79] Because the superior court found Myers incapable of making informed decisions about

her mental illness, API reasons that the state must be permitted to make those decisions for her.[80]

We readily agree that the state's *parens patriae* obligation does give it a compelling interest in administering psychotropic medication to unwilling mental patients in some situations.[81] But this simply raises the difficult question: does the current statutory scheme use an overly intrusive means to attain the state's interest by failing to require an independent judicial determination of the patient's best interests? To answer this question, we turn to the third step of the constitutional balancing test, the least intrusive alternative requirement.

### 3. Least intrusive means requirement

Although API acknowledges that its patient's best interests must be considered, it insists that the superior court's order must be affirmed because the current statutory scheme already meets this criterion by requiring the petitioning facility's physicians to determine, before they petition for authorization, that psychotropic drugs would be in their patient's best interests.[82] API maintains that, so long as doctors make this determination, there is no need for the court to give further consideration to the issue in deciding whether to authorize nonconsensual treatment.

**76.** *In re K.K.B.*, 609 P.2d 747, 751 (Okla.1980).

**77.** Under AS 47.30.839(g), a court can grant authorization to medicate without ever considering whether or not the patient poses a threat of harm to anyone. And a treatment facility may seek involuntary medication of a patient in a non-crisis situation, under AS 47.30.839(a)(2), if the facility "has reason to believe the patient is incapable of giving informed consent" and simply "wishes to."

**78.** *See* AS 47.30.836, .839.

**79.** *Pub. Defender Agency v. Superior Court, Third Judicial Dist.*, 534 P.2d 947, 949 (Alaska 1975); BLACK'S LAW DICTIONARY 1084 (8th ed.2004).

**80.** API also more narrowly and forcefully argues that our decision in *Rust v. State*, 582 P.2d 134 (Alaska 1978), effectively concluded that the state's *parens patriae* duty affirmatively *required* API to give Myers the medications that its doctors recommended. On this point, we disagree.

We noted in *Rust* that some courts have reasoned from the *parens patriae* principle to find that mentally ill persons, once committed, have a "right to treatment." *Id.* at 140. But that observation has no direct bearing here; this case involves the right of a committed patient to refuse forced treatment, not the treatment facility's general obligation to provide treatment to willing patients upon their commitment.

**81.** To conclude otherwise would mean that the state could *never* use psychotropic drugs without the patient's consent—a position that Myers does not assert.

**82.** API supports its claim that the current statutory regime requires a medical determination of best interests by citing AS 47.30.523, AS 47.30.547, AS 47.30.590, AS 47.30.655, AS 47.30.660, AS 47.30.690, AS 47.30.785, AS 47.30.825, AS 47.30.870, AS 47.30.875, and AS 47.30.958. Our decision that a judicial determination of best interests is required makes it unnecessary to consider these provisions.

We disagree. In our view, before a state may administer psychotropic drugs to a non-consenting mentally ill patient in a non-emergency setting, an independent judicial best interests determination is constitutionally necessary to ensure that the proposed treatment is actually the least intrusive means of protecting the patient.

API argues that its doctors can be trusted to adequately protect patients' constitutional interests and claims that this is the legislature's position, too. In API's view, the current statutory scheme reflects a legislative belief that doctors alone are the "proper arbiters" of patients' best interests. And API asserts that its medical staff properly arbitrated here by determining that psychotropics were in Myers's best interest and represented the least intrusive means available to advance the state's interest in her welfare.

But the issue is not one of medical competence or expertise. As we have already seen, the right at stake here—the right to choose or reject medical treatment—finds its source in the fundamental constitutional guarantees of liberty and privacy. The constitution itself requires courts, not physicians, to protect and enforce these guarantees. Ultimately, then, whether Myers's best interests will be served by allowing the state to make a vital choice that is properly hers presents a constitutional question; and though the answer certainly must be fully informed by medical advice received with appropriate deference, in the final analysis the answer must take the form of a legal judgment that hinges not on medical expertise but on constitutional principles aimed at protecting individual choice.

Apart from this overarching need to ensure that courts ultimately decide constitutionally based questions, a secondary factor that militates in favor of independent judicial review of best-interests issues is the inherent risk of procedural unfairness that inevitably arises when a public treatment facility possesses unreviewable power to determine its own patients' best interests. Many cases describe the unavoidable tensions between institutional pressures and individual best interests that can arise in this setting: "The doctors who are attempting to treat as well as to maintain order in the hospital have interests in conflict with those of their patients who may wish to avoid medication.... Economic considerations may also create conflicts[.]" [83] Courts and commentators alike have documented numerous instances in which these tensions have actually resulted in abuse "by those claiming to act in [a patient's] best interests." [84] And even in institutional settings such as prisons, where judicial review of treatment decisions has traditionally not been required, case law strongly suggests that at a minimum, a formal system of independent administrative review may be necessary to guarantee patients' basic due process rights.[85] Notably, in Alas-

---

**83.** *Rogers*, 458 N.E.2d at 317–18 n. 19.

**84.** *Id.* at 320–21. *See, e.g., Rennie v. Klein*, 476 F.Supp. 1294, 1299 (D.N.J.1979) (the medical director of the Marlboro New Jersey State Hospital stated in an office memorandum that the hospital "uses medication as a form of control and as a substitute for treatment"); *Halderman v. Pennhurst State Sch. & Hosp.*, 446 F.Supp. 1295, 1307 (E.D.Pa.1977) (dangerous psychotropic drugs were used on mentally retarded persons "for purposes of behavior control and staff convenience, rather than for legitimate treatment needs"); *Clites v. State*, 322 N.W.2d 917, 921 (Iowa App.1982) (damages awarded where major tranquilizers used on mentally retarded child "as a convenience or expediency program rather than a therapeutic program"); Jessica Litman, Note, *A Common Law Remedy For Forcible Medication of the Institutionalized Mentally Ill*, 82 Colum. L.Rev 1720, 1721 n. 9 (1982) (describing cases in which psychotropic drugs were found to be used "for the conven-ience of the staff and for punishment of patients"); Alexander D. Brooks, *The Constitutional Right to Refuse Antipsychotic Medications*, 8 Bull. Am Acad. of Psychiatry and Law 179, 206 (1980) ("staff too often abuses the management function of medications and slips into the use of medications for its own convenience"); Edward Opton, *Psychiatric Violence Against Prisoners: When Therapy Is Punishment*, 45 Miss. L.J. 605, 623 (1974) ("[I]n mental institutions the bureaucratic needs of the institution for passivity, obedience and submission take precedence over the therapeutic needs of the patients for development of autonomy, initiative, and self-control"); George E. Crane, *Clinical Psychopharmacology in Its 20th Year*, 181 Science 124, 125 (1973) ("drugs are prescribed to solve all types of management problems").

**85.** *See, e.g., Washington v. Harper*, 494 U.S. 210, 233, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (upholding Washington's statutory system pro-

ka, no formal system for independent internal review exists for best interests determinations made by treating physicians at state institutions like API because, despite an express statutory mandate, the Department of Health and Social Services has not yet adopted regulations establishing formal procedures and standards for treating mental patients with psychotropic drugs.[86]

As the Minnesota Supreme Court pointed out in addressing the need for judicial determination of patients' best interests,

> When medical judgments collide with a patient's fundamental rights, ... it is the courts, not the doctors, who possess the necessary expertise.... [T]he final decision to accept or reject a proposed medical procedure and its attendant risks is ultimately *not* a medical decision, but a personal choice.[87]

The Supreme Judicial Court of Massachusetts reached the same conclusion, emphasizing that a judicial resolution of best interests is crucial precisely because decisions based on personal choice often make little sense from a strictly medical perspective:

> The defendants argue that they, as doctors, should be responsible for making treatment decisions for involuntarily committed patients, whether competent or not. We do not agree. "Every competent adult

has a right to '[forgo] treatment, or even cure, if it entails what for him are intolerable consequences or risks however unwise his sense of values may be in the eyes of the medical profession.'" [88]

And Ohio's Supreme Court has similarly described the task of deciding "an involuntarily committed mentally ill person's interest in refusing [psychotropic] medication" as "a uniquely judicial function." [89]

The Minnesota Supreme Court aptly underscored the constitutional underpinnings for its decision that this issue must be directed to the courts:

> The court's responsibility for the patient does not end at commitment. Commitment to an institution does not deprive an individual of all legal rights, ... especially fundamental rights guaranteed by our Constitution. It would be both unreasonable and unnecessary for the courts to become involved in every post-commitment treatment decision; [but] it is equally clear that the courts cannot abdicate *all* responsibility for protecting a committed person's fundamental rights merely because some degree of medical judgment is implicated.[90]

We agree with these decisions and join them in concluding that the right to refuse psychotropic medication is a fundamental

---

viding for review of medication decisions for mentally ill pretrial prisoners by an administrative hearing committee made up of individuals who were not "involved in the inmate's current treatment or diagnosis," but strongly suggesting that the review committee's independence was key to finding Washington's procedure "adequate"); cf. *In re Qawi*, 32 Cal.4th 1, 7 Cal. Rptr.3d 780, 81 P.3d 224, 232 (2004) (citing *Harper*, 494 U.S. at 229, 110 S.Ct. 1028, for the proposition that "even a competent prison inmate, for example, may be forcibly medicated, consistent with the federal due process clause, if it is determined that he is a danger to himself and others, and that the treatment is in his medical interest, as determined by an independent medical board").

86. *See* AS 47.30.660(b)(14) & (16).

87. *Jarvis*, 418 N.W.2d at 147–48 (original emphasis).

88. *Rogers*, 458 N.E.2d at 314 (citing *Harnish v. Children's Hosp. Med. Ctr.*, 387 Mass. 152, 439

N.E.2d 240, 242 (1982)); cf. *Rivers v. Katz*, 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337, 341 (1986) ("a patient's right to determine the course of his medical treatment [is] paramount ... and [] the right of a competent adult to refuse medical treatment must be honored, even though the recommended treatment may be beneficial, or even necessary to preserve the patient's life"); *Steele*, 736 N.E.2d at 20 ("the patient's wishes ... will be honored, no matter how foolish some may perceive that decision to be").

89. *Steele*, 736 N.E.2d at 22. Cf. *Price v. Sheppard*, 307 Minn. 250, 239 N.W.2d 905, 912–13 (1976) ("Because the potential impact of the more intrusive forms of treatment is so great, we are reluctant in those cases where the patient or guardian refuse their consent, to leave the imposition of the more intrusive forms of treatment solely within the discretion of medical personnel at our state hospitals."); *Jarvis*, 418 N.W.2d at 148 ("[w]hen intrusive treatment is proposed, the 'professional judgment' of medical personnel insufficiently protects this basic human right").

90. *Jarvis*, 418 N.W.2d at 147 (original emphasis).

right, though not an absolute one; that the ultimate responsibility for providing adequate protection of that right rests with the courts; and that adequate protection of that right can only be ensured by an independent judicial determination of the patient's best interests considered in light of any available less intrusive treatments.[91]

### 4. Best-interests criteria

Having determined that courts must engage in best-interest inquiries, we believe that some discussion is in order concerning appropriate criteria to guide courts on this issue.

■ Evaluating whether a proposed course of psychotropic medication is in the best interests of a patient will inevitably be a fact-specific endeavor. At a minimum, we think that courts should consider the information that our statutes direct the treatment facility to give to its patients in order to ensure the patient's ability to make an informed treatment choice.[92] As codified in AS 47.30.837(d)(2), these items include:

(A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;

(B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;

(C) a review of the patient's history, including medication history and previous side effects from medication;

(D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and

(E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment[.] [93]

Considering these factors will be crucial in establishing the patient's best interests as well as in illuminating the existence of alternative treatments.[94]

And here, too, we find the work of other state courts to be helpful. The Supreme Court of Minnesota has held that in order to determine the "necessity and reasonableness" of a treatment, "courts should balance [a] patient's need for treatment against the intrusiveness of the prescribed treatment." [95] Factors that the Minnesota court believed should be considered included:

(1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment;

(2) the risks of adverse side effects;

(3) the experimental nature of the treatment;

(4) its acceptance by the medical community of the state; and

(5) the extent of intrusion into the patient's body and the pain connected with the treatment.[96]

We find these approaches to be sensible.

---

91. *Cf. Steele,* 736 N.E.2d at 21 (the state can forcibly medicate a mental patient under its *parens patriae* authority only after a court finds, "by clear and convincing evidence, that (1) the patient does not have the capacity to give or withhold informed consent regarding his/her treatment, (2) it is in the patient's best interest to take the medication, *i.e.,* the benefits of the medication outweigh the side effects, and (3) no less intrusive treatment will be as effective in treating the mental illness"); and *Rivers v. Katz,* 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337, 344 (1986) (if a "court concludes that the patient lacks the capacity to determine the course of his own treatment," the court must then "determine whether the proposed treatment is narrowly tailored to give substantive effect to the patient's

liberty interest, taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments").

92. AS 47.30.837(d)(2).

93. *Id.*

94. *See id.,* subsection (d)(2)(E).

95. *Price,* 239 N.W.2d at 913.

96. *See id.*

■ Finally, we note that the parties have disputed the standard of proof that the state should be required to meet in establishing the patient's best interests. API argues for a preponderance of the evidence standard, but it offers no legal authority to support that position. Other courts that have required best-interests determinations in this area have uniformly adopted the clear and convincing standard.[97] Moreover, our existing statutory scheme already adopts this standard for findings required to authorize psychotropic medication.[98] We see no reason to dilute the standard governing the best-interests determination, and hold that the clear and convincing evidence standard controls the issue.

### 5. Substituted-judgment standard

Myers separately argues that we should follow the example of the Supreme Judicial Court of Massachusetts and require courts authorizing medication to make an additional finding applying the "substituted judgment" approach.[99] The substituted-judgment approach would require courts to attempt to determine what course of treatment an incompetent patient would likely choose if currently capable of making an informed decision.

But unlike the statutory scheme at issue in Massachusetts cases, our own statutes incorporate provisions designed to achieve the same goals as the substituted-judgment approach, but by a slightly different path. As already mentioned above, when a treatment facility files a petition for authorization to treat a mentally ill patient with psychotropic drugs, Alaska law requires the appointment of a "visitor" to help gather relevant information for the hearing. One of the two core duties assigned to the visitor under AS 47.30.839(d) is to investigate, document, and report any prior statements—oral or written—that the patient might have made while competent that expressed wishes regarding medication.[100] Moreover, as also described above, if the information gathered and documented by the visitor enables the court to find that the patient has expressed a prior competent desire not to be medicated, then the court may not authorize treatment; this emerges from the language of AS 47.30.839(g), which requires the court to order treatment only if it finds that a patient is presently incompetent *and* that the patient was incompetent at the time of any previously expressed wishes reported by the visitor:

(g) *If the court determines that the patient is not competent* to provide informed consent *and,* by clear and convincing evidence, *was not competent to provide informed consent at the time of previously expressed wishes* documented [by the visitor] under (d)(2) of this section, *the court shall approve the facility's proposed use of psychotropic medication.*[101]

Because neither party has briefed or addressed this provision on appeal, and because Myers did not attempt to rely on it below,[102]

---

97. *See, e.g., Steele,* 736 N.E.2d at 20; *In re M.P.,* 510 N.E.2d 645, 647 (Ind.1987); *People v. Medina,* 705 P.2d 961, 973 (Colo.1985).

98. *See* AS 47.30.839(g).

99. *See Rogers,* 458 N.E.2d at 323.

100. In relevant part, AS 47.30.839(d) says:

Upon the filing of a petition ... the court shall direct the office of public advocacy to provide a visitor to assist the court in investigating the issue of whether the patient has the capacity to give or withhold informed consent to the administration of psychotropic medication. The visitor shall gather pertinent information and present it to the court in written or oral form at the hearing. The information must include documentation of the following:
. . . .

(2) any expressed wishes of the patient regarding medication, including wishes that may have been expressed in a power of attorney, a living will, an advance health care directive . . ., or oral statements of the patient, including conversations with relatives and friends that are significant persons in the patient's life as those conversations are remembered by the relatives and friends; oral statements of the patient should be accompanied by a description of the circumstances under which the patient made the statements, when possible.

101. (Emphasis added.)

102. In fact it appears that the visitor in this case was unable to submit a complete report. Myers voiced no objection, did not ask for a more complete investigation of prior expressed wishes, and did not ask for a ruling addressing the point. The superior court's decision made no finding on

we need not decide its exact scope and meaning, and express no opinion on the point here. At least arguably, though, it might be read to give courts authority to deny a petition if the patient made prior competent statements expressing a desire not to be medicated; and if so, it would seem to serve a similar purpose to that of the substituted-judgment approach advocated by Myers. Since the meaning of this provision is not at issue here and remains open for future consideration, and since the provision may ultimately be interpreted as performing many of the same functions as the substituted-judgment approach, we see no present need to decide Myers's argument urging us to adopt that approach.

## IV. CONCLUSION

We conclude that the Alaska Constitution's guarantees of liberty and privacy require an independent judicial determination of an incompetent mental patient's best interests before the superior court may authorize a facility like API to treat the patient with psychotropic drugs. Because the superior court did not determine Myers's best interest before authorizing psychotropic medications, we VACATE its involuntary treatment order. Although no further proceedings are needed here because Myers's case is now technically moot, we hold that in future non-emergency cases a court may not permit a treatment facility to administer psychotropic drugs unless the court makes findings that comply with all applicable statutory requirements and, in addition, expressly finds by clear and convincing evidence that the proposed treatment is in the patient's best interests and that no less intrusive alternative is available.

the issue of prior expressed wishes, and Myers has not pursued that point on appeal.