**NOTICE**

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |
|---|---|
| In the Matter of the Necessity of the Hospitalization of<br><br>R.M. | )<br>)  Supreme Court Nos. S-18144/18193<br>)  (Consolidated)<br>)<br>)  Superior Court No. 3AN-21-01446 PR<br>)<br>)  <u>MEMORANDUM OPINION</u><br>)     <u>AND JUDGMENT</u>*<br>)<br>)  No. 1968 – May 17, 2023 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Jr., Judge.

Appearances: Megan R. Webb and Justin N. Gillette, Assistant Public Defenders, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Robert Kutchin, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

---

\*      Entered under Alaska Appellate Rule 214.

## I. INTRODUCTION

R.M.[1] was involuntarily committed for 30 days after the superior court concluded he was mentally ill and likely to cause serious harm to others. The court also granted the State's subsequent petition for authority to administer psychotropic medications during R.M.'s hospitalization. R.M. appeals the 30-day commitment order, arguing that the court abused its discretion by admitting certain expert testimony and that it clearly erred by finding he was likely to cause serious harm. He also appeals the involuntary medication order, arguing that the court clearly erred by finding that he lacked the capacity to give or withhold consent. We find no error in either order and therefore affirm.

## II. FACTS AND PROCEEDINGS

### A. Background

In June 2021 R.M. allegedly engaged in self-harm and threatened to kill his grandparents. Police took him to a hospital emergency room. Later that day a counselor petitioned the superior court for an order authorizing R.M.'s hospitalization for a mental health evaluation,[2] which the court granted. R.M. was transferred to the Alaska Psychiatric Institute (API). API staff conducted an evaluation, then petitioned the court for a 30-day involuntary commitment order on grounds that R.M. was mentally ill and likely to cause serious harm to others.[3]

---

[1]     Although our usual practice is to use pseudonyms in civil commitment cases to respect appellants' privacy, we use initials here at the appellant's request.

[2]     *See* AS 47.30.705.

[3]     *See* AS 47.30.735(c) (providing that "the court may commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and

**B.     Hearing On Petition For 30-Day Commitment Order**

The court held a hearing on the petition, at which API's only witness was Dr. Andrew Pauli, R.M.'s treating psychiatrist. Dr. Pauli was qualified as an expert witness in psychiatry and testified based on his personal evaluation of R.M., his conversations with R.M.'s grandparents, his review of R.M.'s past history at API, and his conversations with API staff involved in R.M.'s two prior admissions.

Dr. Pauli testified that R.M. had schizophrenia, a thought disorder generally characterized by disorganization, hallucinations, delusions, and paranoia. He testified that R.M.'s "presentation [was] complicated," noting that "he appear[ed] to have had a number of neuropsychiatric insults over the years." Dr. Pauli clarified that notwithstanding the overarching diagnosis of schizophrenia, "there may be other things going on that may . . . worsen the course of illness [and] treatment." He testified that R.M. talked about "hearing demon voices" and experienced delusions.

Dr. Pauli was asked whether there had been incidents since R.M.'s arrival at API that made him believe that R.M. "pose[d] a risk of harm." He answered:

> [R.M.] continues to be extremely disorganized at time[s]. It's hard for him to convey his ideas. He's preoccupied with child molesters for some reason. And [he] has had two episodes where he was down at the far door which [connects] to the adolescent unit, pounding on the door, yelling about child molesters. And on one of the occasions . . . he threatened the staff and took a swing at them on . . . two occasions.

R.M. objected to this testimony on hearsay grounds because Dr. Pauli had not personally witnessed the episodes he described. The State countered that the testimony

convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled").

fell within the hearsay exception for statements made for purposes of medical diagnosis or treatment,[4] arguing that Dr. Pauli had to "rely on other people in the hospital to form his entire opinion of the patient." The court overruled the objection, noting that the testimony "squarely falls within that hearsay exception . . . since it was taken at the hospital" and was communicated "by staff members to another treatment provider."

Dr. Pauli then described the two incidents in more detail. In the first, R.M. "was up in the middle of the night kicking the door, yelling about child molesters, [and] waking people up." Dr. Pauli testified that R.M. believed he was being watched by cameras, was "making odd gestures," and "attempted to hit the staff." Dr. Pauli said that R.M. later justified his conduct by explaining that the staff members were "probably child molesters." A second incident involved R.M. "yelling and kicking," though this incident "was not as physical, it was more verbal." Dr. Pauli affirmed that R.M.'s mental illness contributed to his volatility. On cross-examination Dr. Pauli explained that API staff did not call police about the incidents because such behavior was common at the facility and no one was physically harmed, an outcome he attributed to staff alertness and training.[5]

R.M. addressed the same incidents in his own testimony. He said he had been "very mad" and "railing about child pornography" because he did not think there should be a children's unit at API. He said he had attempted to hit a staff member

---

[4]  *See* Alaska R. Evid. 803(4).

[5]  Dr. Pauli also testified there were no less restrictive alternatives for treatment, that he believed R.M. could benefit from treatment at API, that R.M. took his medications "[m]ost of the time," and that if left untreated R.M.'s symptoms were likely to continue. These aspects of Dr. Pauli's testimony are not challenged on appeal.

because that person had laughed at him for talking about his child pornography concerns.

The State based its closing argument that R.M. was likely to cause serious harm to others on the two incidents Dr. Pauli described.

The court made oral findings on the record and authorized R.M.'s commitment for up to 30 days. The court found that the State had demonstrated clearly and convincingly that R.M. was likely to cause serious harm if released, based on Dr. Pauli's testimony about the two incidents at API. The court later issued a written 30-day commitment order. R.M. appeals the order.

### C. 90-Day Commitment And Involuntary Medication Order

In August 2021 API filed a petition seeking to extend R.M.'s commitment by up to another 90 days. The superior court held a hearing and granted the petition. R.M. does not challenge this order.

Dr. Pauli testified again at the hearing. Based on that testimony, the court found that R.M. continued to be "mentally ill, likely to cause harm to others, and . . . gravely disabled." The court also found that R.M. had "inflicted significant bodily harm on others since his arrival at API" and had "physically assaulted his treating psychiatrist and threatened other staff." The court found that API was an appropriate treatment facility, that R.M.'s "mental health ha[d] arguably improved, albeit slowly," during his stay there, and that Dr. Pauli anticipated further improvement with "treatment and appropriate medication" at API.

Several days later API filed a petition seeking authorization to administer involuntary psychotropic medications, specifically clozapine and benztropine in non-crisis situations, chlorpromazine in crisis situations, and olanzapine, fluphenazine, diphenhydramine, and lorazepam in both crisis and non-crisis situations. The court held

another hearing at which API presented two witnesses. The court visitor testified first.[6] Her testimony was based on five conversations she had had with R.M., including one earlier that day. She testified that when she last spoke to R.M. "[h]e was oriented and at times he knew his name and location," he was calm and "able to follow the conversation," and "[h]is thought process appeared fairly rational." She also noted, however, that R.M. did "not agree that he exhibits symptoms consistent with a mental health diagnosis," did "not recognize the need for treatment," and was not "able to identify alternative treatment that might be helpful to him." She testified that R.M. told her "he did not have concerns about taking medication, and he was not able to identify any side effects." She concluded that "he does not appear to have capacity to give [informed] consent."

The court visitor testified that she had also spoken to R.M.'s grandmother, who was petitioning to be his guardian; the grandmother, too, "was unable to identify any significant [medication] side effects to [R.M.]." The grandmother did not know what specific drugs R.M. was taking, but she told the court visitor that R.M. "exhibit[ed] a pattern of being prescribed medication, stabilizing, and then promptly going off the medication."

The court next heard testimony from Dr. Pauli, who agreed with the court visitor's conclusion that R.M. did not have the capacity to give or withhold his informed consent to medication. Dr. Pauli explained that although API's petition initially sought authority only for the administration of non-crisis medication, R.M. had needed crisis

---

**6** *See* AS 47.30.839(d) (requiring court visitor to investigate and report in order "to assist the court in investigating the issue of whether the patient has the capacity to give or withhold informed consent to the administration of psychotropic medication").

medication at least three times over the past few days.  And the night before the hearing R.M. had "some awareness" and asked "for crisis meds to control himself."

Dr. Pauli's testimony touched on the medications listed in the petition.  He explained that olanzapine, clozapine, and fluphenazine all treat psychosis, schizophrenia, delusions, and hallucinations.  R.M. had been on olanzapine and clozapine before, and Dr. Pauli stated that other providers had reported that R.M.'s status improved while on the clozapine.  But R.M. did not want to take clozapine again because it necessitated weekly blood tests.  Dr. Pauli prescribed olanzapine instead, but it was not as effective.  Dr. Pauli therefore wanted to return to clozapine, with olanzapine and fluphenazine serving as back-up options.  He explained that some of the other medications would be used to treat side effects and anxiety.

Dr. Pauli predicted that the proposed course of treatment would improve R.M.'s prognosis significantly, but he could not say what the "top potential for improvement" was.  He testified that if R.M. did not take this medication, he might have to be committed for another 90 days.  Dr. Pauli also predicted that R.M. was not likely to follow a medication plan voluntarily.

Dr. Pauli explained that API had given R.M. written information about the medications and that R.M. had not made any reasonable objections.  He concluded that R.M. did not appreciate the gravity of his mental illness and did not "have the capacity to understand the relevant facts about the medications."  He also testified that R.M. once assaulted him when he was trying to explain the importance of clozapine.

R.M. also testified at the medication hearing.  He disputed Dr. Pauli's statement that he was averse to blood tests, critiqued the doctor's expertise, and said he rarely saw him at API.  He claimed to have never spoken with Dr. Pauli about the proposed medication, though he admitted speaking with others about it.  He said he was willing to have a blood test and was willing to take oral medication, though he

explained, "I prefer not to be on medications because I don't like to be dependent on something that I know is temporary and always different and always changing," and he did not "see the use of" the proposed medications.

At the end of the hearing the court made oral findings on the record and approved API's petition. The court later issued a written order which incorporated the findings from the 30-day and 90-day commitment orders. Based on the testimony of the court visitor and Dr. Pauli, the court found by clear and convincing evidence that R.M. was "unable to give or withhold informed consent." The court therefore granted API permission to administer psychotropic medications in crisis and non-crisis situations.

R.M. appeals the medication order as well as the 30-day commitment order.

## III.   STANDARD OF REVIEW

"We review a trial court's '[f]actual findings in involuntary commitment or medication proceedings . . . for clear error' " and will "reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[7] We "review a trial court's decision to admit or exclude evidence for an abuse of discretion."[8] "We will find an abuse of discretion when the decision on review is manifestly

---

[7] *In re Hospitalization of Rabi R.*, 468 P.3d 721, 730 (Alaska 2020) (alterations in original) (quoting *In re Hospitalization of Danielle B.*, 453 P.3d 200, 202 (Alaska 2019)).

[8] *Jones v. Bowie Indus., Inc.*, 282 P.3d 316, 324 (Alaska 2012).

unreasonable."[9]  When an issue was not raised to the trial court, we review it for plain error, which "involves an 'obvious mistake' that is 'obviously prejudicial.' "[10]

## IV.   DISCUSSION

### A.   The Trial Court Did Not Abuse Its Discretion Or Clearly Err In Granting The 30-Day Commitment Order.

#### 1.   The trial court did not abuse its discretion by admitting Dr. Pauli's testimony about the incidents at API.

The Alaska Evidence Rules broadly prohibit the admission of hearsay,[11] but Rule 803(4) provides an exception for statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."  We apply a two-part test when determining whether this exception applies:  (1) the speaker's motive must have been "consistent with the purpose of [Rule 803(4)]" and (2) it must be "reasonable for the physician to rely on the information in diagnosis and treatment."[12]  The burden of proving the foundational facts is on the proponent of the evidence.[13]

---

[9]  *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015).

[10]  *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014) (quoting *Adams v. State*, 261 P.3d 758, 773 (Alaska 2011)).

[11]  "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Alaska R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Alaska Supreme Court, or by enactment of the Alaska Legislature."  Alaska R. Evid. 802.

[12]  *Davison v. State*, 282 P.3d 1262, 1266 (Alaska 2012) (quoting *Sluka v. State*, 717 P.2d 394, 399 (Alaska App. 1986)).

[13]  *Dobos v. Ingersoll*, 9 P.3d 1020, 1024 (Alaska 2000).

R.M. argues that the superior court should not have allowed Dr. Pauli to describe the two incidents of violent behavior that were relayed to him by other members of API's staff because "[t]here is no evidence in the record" that these reports "were made for purposes of medical diagnosis or treatment." R.M. argues that because the State "did not lay a proper foundation for the testimony to be admissible under this hearsay exception," a conclusion that "the statements were made for the purposes of treatment or diagnosis is speculative."

We conclude, however, that the admission of Dr. Pauli's testimony under Rule 803(4) was not an abuse of discretion. Staff members at a facility dedicated to the diagnosis and treatment of patients like R.M. with psychiatric disorders informed a treating psychiatrist that his patient had acted violently and irrationally. The described behavior was both relevant to the patient's diagnosis and informative for his treatment. It is reasonable to assume that the statements were motivated by both the speakers' and the doctor's professional responsibilities to a patient in their care. A statement made by health care providers within the confines of a hospital is not necessarily a statement "made for purposes of medical diagnosis or treatment," but here the evidence supports a conclusion that the statements at issue had just such a purpose. The information about R.M.'s conduct was specifically relevant to his mental health — the reason for his hospitalization — and Dr. Pauli relied on it in developing a prognosis and prescribing treatment.

Because testimony about the two incidents of violent behavior was admissible under Evidence Rule 803(4), the superior court's decision to admit it was not an abuse of discretion.

**2.      The trial court did not abuse its discretion by admitting Dr. Pauli's expert opinion that R.M. was likely to cause harm to others.**

We also conclude that the superior court did not abuse its discretion when it allowed Dr. Pauli to testify that R.M. was likely to cause harm to others. Alaska Evidence Rule 702(a) allows an expert to give opinion testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."

R.M. argues that a "corollary of [Rule 702(a)] is . . . that experts should not be allowed to state their own conclusions on points that the fact-finder is equally capable of determining for themselves." R.M. contends that because the superior court could have determined for itself whether R.M. presented a risk of harm to others, Dr. Pauli's testimony on the question was inadmissible. R.M. did not object on this ground at trial, so the issue is subject only to plain error review, as R.M. concedes.[14]

R.M.'s argument that Dr. Pauli's testimony was not helpful to the trier of fact and therefore inadmissible ignores the very nature of a 30-day commitment proceeding. Dr. Pauli initiated the proceeding as one of the two mental health professionals who signed the petition. As a petitioner he necessarily alleged that commitment was justified under the relevant statutory standard, specifically that R.M. was mentally ill and, as a result, was "[l]ikely to cause serious harm to others." Having made these allegations and been granted a hearing to prove them, Dr. Pauli could be expected to testify that the allegations were true. And as the State notes, "[w]ithout Dr. Pauli's opinion, the trial court — presumably with no medical training — would have been left guessing at how R.M.'s 'complicated' condition would manifest in future

---

**14**      *See In re Gabriel C.*, 324 P.3d at 838.

behaviors." The doctor's testimony was not only helpful, it was critical to the superior court's ability to determine whether the statutory standard for a 30-day civil commitment was met.

In opposition, R.M. analogizes to two cases in which we concluded that expert opinion testimony should have been excluded, but the analogies are inapt. In *Spenard Action Committee v. Lot 3, Block 1, Evergreen Subdivision*,[15] we held that the trial court erred by allowing expert opinion testimony from police officers as to whether a particular property was operating as a house of prostitution.[16] We reasoned that these opinions did "not meet the criteria for scientific, technical, or other specialized knowledge which would assist the trier of fact as required by Evidence Rule 702(a)."[17] This "helpfulness standard" requires experts to "stop short of stating their own conclusions on [points that] the jury is at least equally capable of [determining]."[18] Dr. Pauli brought to bear his specialized education and training as well as more than ten years of experience treating psychiatric patients to help the superior court understand whether R.M.'s condition rendered him a serious threat to himself or others. The court was not "equally capable" of reaching this medical conclusion without Dr. Pauli's testimony.

In *City of Kodiak v. Samaniego* we held that the trial court did not abuse its discretion by excluding, as unhelpful, use of force testimony from an expert who had submitted a report containing "solely conclusory opinions" describing a police officer's

---

[15] 902 P.2d 766 (Alaska 1995).

[16] *Id.* at 780-81.

[17] *Id.* at 781.

[18] *Id.* at 780 (alterations in original).

disputed seizure of the plaintiff as "objectively reasonable."[19]   But *Samaniego* is distinguishable in that the expert report drew inadmissible legal conclusions, invading the province of the court.[20]   Here, in contrast, Dr. Pauli's conclusions were factual: R.M.'s mental illness would likely result in harmful behavior toward others.  That this factual conclusion also satisfied the legal test does not limit the expert's ability to state it.

R.M. briefly argues that Dr. Pauli's testimony did not rely on "scientific, technical or other specialized knowledge"[21] because it "was based on others' observations of R.M. while at API rather than his medical expertise."  We reject this argument.  As the State notes, experts routinely rely on the eyewitness accounts of others, which the expert then "interpret[s] through the lens of specialized knowledge."  The commentary to Rule 703 explains that expert opinions may be based upon "presentation of data to the expert outside of court and other than by his own perception," as the expert "should be allowed to utilize the tools that [the expert] normally uses to practice [the expert's] skills outside of the court."[22]

Dr. Pauli's testimony drew from his specialized knowledge and experience and relied on permissible sources to reach a factual conclusion critical to the

---

[19]   83 P.3d 1077, 1088-89 (Alaska 2004).

[20]   *Id.*

[21]   Alaska R. Evid. 702(a).

[22]   Alaska R. Evid. 703 cmt.

court's ultimate decision whether the legal test was satisfied. There was no error, "obvious" or otherwise,[23] in the admission of Dr. Pauli's testimony.[24]

> **B. The Trial Court Did Not Clearly Err In Finding That R.M. Did Not Have Capacity To Give Or Withhold Informed Consent To Medication.**

Individuals have a fundamental constitutional right to refuse to take psychotropic medication.[25] In certain situations the State may administer medication against the patient's will and "regardless of whether the patient is capable of giving informed consent."[26] But it may do so without a specific court order only "during no more than three crisis periods."[27] After three crisis periods, or in any non-crisis situation, the State may force an individual to take psychotropic medication only "if the individual 'is determined by a court to lack the capacity to give [or withhold] informed consent' to the medication, and the State demonstrates 'by clear and convincing evidence that the involuntary administration of psychotropic medication is in the best interests of the patient and that no less intrusive alternative treatment is available.' "[28]

---

[23]     *See In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014) (holding that determination of plain error requires "obvious mistake") (quoting *Adams v. State*, 261 P.3d 758, 773 (Alaska 2011)).

[24]     Because we conclude that Dr. Pauli's opinion was admissible, we do not need to decide whether its admission was "plain error." Nor do we need to address R.M.'s argument that absent Dr. Pauli's testimony the superior court lacked clear and convincing evidence that R.M. was likely to cause harm to others.

[25]     *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 187 (Alaska 2009).

[26]     AS 47.30.838(a).

[27]     AS 47.30.838(c).

[28]     *In re Hospitalization of Naomi B.*, 435 P.3d 918, 934 (Alaska 2019) (alteration in original) (quoting *Bigley*, 208 P.3d at 179-80). The court must also

The superior court in this case made all three required findings. R.M. challenges only the finding that he lacked the capacity to give or withhold informed consent.

Under AS 47.30.837(a), a patient has capacity to give or withhold informed consent "if the patient is competent to make mental health or medical treatment decisions and the consent is voluntary and informed." Patients are "competent" under the statute when they have "the capacity to assimilate relevant facts," "appreciate[] that [they have] a mental disorder or impairment,"[29] have "the capacity to participate in treatment decisions," and "articulate reasonable objections to the offered medication."[30] "[A] superior court may find a patient incompetent to make medical treatment decisions based on the lack of a single element in AS 47.30.837(d)(1)."[31] The focus of the inquiry is on whether "the patient is *presently* incapable of giving or withholding informed consent."[32] We review the court's finding for clear error.[33]

In this case, finding "clear and convincing evidence [that R.M. was] unable to give or withhold informed consent," the superior court did not explicitly rely

---

consider whether the patient previously expressed wishes regarding medication while the patient did have capacity. AS 47.30.839(e).

[29] R.M. cites to our statement in *Myers v. Alaska Psychiatric Institute*, 138 P.3d 238 (Alaska 2006): "Under this provision, a patient's inability to appreciate the presence of a mental disorder is a relevant consideration but is not dispositive." *Id.* at 243. In *re Hospitalization of Jacob S.* we held that this statement in *Myers* was dicta and not controlling. 384 P.3d 758, 770-71 (Alaska 2016). And regardless, the superior court here did not rely explicitly on any one factor in its findings.

[30] AS 47.30.837(d)(1).

[31] *In re Jacob S.*, 384 P.3d at 771.

[32] *Myers*, 138 P.3d at 244 (emphasis added).

[33] *Jacob S.*, 384 P.3d at 771-72.

on any one factor from AS 47.30.837(d)(1). The court relied on the court visitor's description of her conversations with R.M. and Dr. Pauli's testimony as R.M.'s treating psychiatrist. The court also relied on its own observations of R.M., calling him "very intelligent and articulate, [but] the topics of his discussion [while testifying] would frequently [waver] and become highly tangential and off-topic."

R.M. focuses on Dr. Pauli's testimony that the night before the hearing, after already receiving three courses of crisis medications, R.M. asked for crisis medications "to control himself" because "he knew he was out of control." In response R.M. was given an injection of chlorpromazine.[34] According to R.M., this testimony shows that "API clearly believed that R.M. had the capacity to consent to psychotropic medication," and there is no evidence that he lost capacity between that night and the time of the hearing. He contends that the court clearly erred by not acknowledging the import of these undisputed facts.

The State responds that "both the court visitor and Dr. Pauli expressly testified that R.M. lacked capacity[, and] the existence of arguably conflicting evidence does not undermine the court's factual finding." We agree. Considerable evidence supported a finding of incapacity under several of the elements listed in AS 47.30.837(d)(1). Both Dr. Pauli and the court visitor testified that R.M. did not understand the seriousness of his diagnoses. According to Dr. Pauli, R.M. did not "have the capacity to understand the relevant facts about" the proposed medication plan. And the court visitor testified that R.M. failed "to articulate reasonable objections" to the

---

[34]     R.M. also notes that this dosage of crisis medication was his fourth without a court order and so if he *did not* have capacity to consent to it, then his rights may have been violated by the State. But R.M. has not challenged the decision to administer this round of medication, and so we do not address that argument.

plan. This is sufficient evidence to support the court's finding.[35] The question is whether Dr. Pauli's testimony about R.M.'s capacity the night before the hearing undermines the court's finding sufficiently to render it clearly erroneous.

"When reviewing factual findings we ordinarily will not overturn a trial court's finding based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling."[36] "It is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[37] To conclude that a finding is clearly erroneous, "[s]uch evidentiary weight and such convictional certainty must be present" that we cannot "escape the view that the trial court has failed to make a sound survey of or to accord the proper effect to all of the cogent facts," especially in light of the trial court's appraisal of witness credibility.[38]

We cannot say that the superior court's finding of incapacity was clearly erroneous, even in light of R.M.'s apparent ability to consent to a one-time administration of crisis medication the night before. The question the court needed to determine was whether R.M. was "*presently* incapable of giving or withholding

---

[35] *Cf. In re Hospitalization of Mark V.*, 501 P.3d 228, 237 (Alaska 2021) (concluding based on somewhat similar evidence that patient did not have capacity).

[36] *Tessa M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (citations omitted).

[37] *Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999).

[38] *Isaacs v. Hickey*, 391 P.2d 449, 451 (Alaska 1964) (quoting *Nee v. Linwood Sec. Co.*, 174 F.2d 434, 437 (8th Cir. 1949)).

informed consent"[39] to administration of "the *offered* medication."[40]  The offered medication was a course of antipsychotics and other drugs to be administered daily over time.  A moment of lucidity and apparent consent to a single administration of medication the night before does not negate the evidence supporting the superior court's finding that R.M. lacked capacity to consent to this proposed regimen.[41]  And it is the trial court's job, not ours, to weigh conflicting evidence.[42]  We hold that the court did not clearly err in finding that R.M. lacked capacity to give or withhold consent to the medication plan.

## V.    CONCLUSION

We AFFIRM the 30-day commitment order and the involuntary medication order.

---

[39]     *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 244 (Alaska 2006) (emphasis added).

[40]     AS 47.30.837(d)(1)(D) (emphasis added).

[41]     We have implicitly acknowledged that a person's competence is not always static.  *See In re Hospitalization of Lucy G.*, 448 P.3d 868, 875 (Alaska 2019) ("Court-ordered mental health treatment . . . may not be provided to any person who has regained capacity to consent to or decline treatment.").

[42]     *Knutson*, 973 P.2d at 599-600.