*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-18077 |
| TONJA P. | ) ) ) ) ) ) ) ) | Superior Court No. 3AN-21-00530 PR<br><br>O P I N I O N<br><br>No. 7642 – February 17, 2023 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Julia Bedell, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Tonja P. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Chief Justice, Maassen, Carney, and Borghesan, Justices. [Henderson, Justice, not participating.]

CARNEY, Justice.

## I.     INTRODUCTION

A woman appeals court orders authorizing her involuntary commitment and administration of psychotropic medication. She argues the superior court erred by relying on a cursory report from the court visitor and by failing to make specific findings that involuntary medication was in her best interests. She also contends that it was error to commit her to a psychiatric hospital instead of to a less restrictive facility. We affirm

the superior court's orders.

## II. FACTS AND PROCEEDINGS

### A. Facts

Tonja P.[1] suffers from schizophrenia; before March 2021 she had previously been committed to the Alaska Psychiatric Institute (API) six times. Between 2016 and 2021 Tonja lived with her parents and was able to manage her illness with outpatient treatment. In March 2021 her health deteriorated after she stopped taking medication. She became unable to care for her hygiene and other needs and became aggressive with her parents. Tonja went to API voluntarily but after she was admitted she declined medication. API petitioned for an order authorizing Tonja's hospitalization for evaluation. Tonja's father, who is her legal guardian, supported API's request. The superior court granted the evaluation order.

A day later API filed a petition to commit Tonja for 30 days for treatment[2] and a petition to authorize the involuntary administration of psychotropic medication.[3] The commitment petition alleged Tonja was mentally ill and was "[c]urrently psychotic, responding to internal stimulation (hallucinations) and unable to communicate effectively." It also alleged she was gravely disabled because she was unable to make an informed decision or to communicate her needs. The petition asserted that Tonja would not be safe and would be unable to obtain shelter or food outside of API. The involuntary medication petition sought authorization to treat Tonja with two psychotropic medications.

---

[1]     We use a pseudonym to protect her identity.

[2]     *See* AS 47.30.730-.735 (setting out 30-day commitment procedure).

[3]     *See* AS 47.30.839 (describing procedures for seeking court order to administer psychotropic medication).

**B. Proceedings**

**1. 30-day commitment and medication petitions**

A combined hearing on both petitions was held before a master on March 11. API presented Tonja's treating psychiatrist, Dr. Laura Swogger, as an expert witness in psychiatry. Dr. Swogger testified that Tonja initially had been aggressive at API and had bitten one of the officers who brought her in. She testified that Tonja had since become withdrawn and isolated, and was not able to organize her thoughts or communicate in a coherent manner. She acknowledged that Tonja was taking care of her basic needs but required "a lot of supervision and prompting." Dr. Swogger testified that Tonja had voluntarily taken medication when she first arrived at API, but that she began refusing medication shortly after her admission. Dr. Swogger testified that she spoke with Tonja's father, who stated he and her mother wanted her to return home but not until her condition improved.

Dr. Swogger also testified that Tonja would not be able to function if released to a homeless shelter because she would be unable to care for her basic needs and would easily be victimized because of her "confused" and "disoriented" mental state. Dr. Swogger explained that API offered a variety of types of therapy but that Tonja would not benefit from them until her psychosis improved, which required medication. She testified that a similar treatment plan had worked for Tonja in the past. Dr. Swogger also stated that she was unaware of any outpatient provider that would accept someone with Tonja's level of need.

Tonja was provided with an opportunity to testify, but she was unable to speak coherently and eventually declined to speak. Because Tonja was unable to

communicate her wishes, her attorney took no position on the commitment petition[4] except to emphasize API's high burden.

The superior court accepted the master's recommendation and granted the commitment petition. It found that Tonja was mentally ill because she "has a long-standing, professional diagnosis of schizophrenia"; that Tonja was gravely disabled because "[h]er mental illness precludes her from safely taking care of her physical needs"; and that she "w[ould] suffer increasingly severe mental distress" if untreated. The court also relied on Dr. Swogger's testimony that no other "outpatient treatment or program would be effective and safe at this time."

The superior court next addressed the medication petition. The court-appointed visitor[5] testified that Tonja could not follow a conversation; was confused about her name, what year it was, and where she was located; and denied having a mental illness. The court visitor described Tonja as "confused and disorganized" and "actively delusional." She stated that Tonja had not expressed any reasonable objections to medication or identified any side effects that concerned her. The court visitor concluded that Tonja did not have the capacity to give consent, to assimilate information regarding her diagnosis and treatment, to make treatment decisions or participate in treatment, and lacked insight or the ability to rationally engage in treatment decisions. She testified that she attempted to reach Tonja's father but was unsuccessful, and that Tonja "does not appear to have an advance[] health care directive."

---

[4]    *See* Alaska R. Prof. Conduct 1.2(a) and comment (describing lawyer's general obligation to consult with client); Alaska R. Prof. Conduct 1.14 and comment (describing lawyer's duties to clients with impaired capacity).

[5]    *See* AS 47.30.839(d) (providing for court appointment of visitor "to assist the court in investigating the issue of whether the patient has the capacity to give or withhold informed consent to the administration of psychotropic medication.").

Dr. Swogger was called again. She agreed with the court visitor's conclusions. Dr. Swogger testified that she planned to administer the antipsychotic medication risperidone to Tonja, but to have a second medication, haloperidol, as a backup in case Tonja did not tolerate risperidone. She testified that the medication plan was within the standard of care for schizophrenia, that Tonja had successfully been treated with both medications in the past without negative effects, and that her risk for side effects was low. Dr. Swogger also testified that API took the potential for side effects very seriously, and she detailed measures to monitor and address potential side effects. Finally, Dr. Swogger testified that medication was in Tonja's best interest because her condition would "probably stay the same or . . . potentially worsen" without it. Tonja's attorney again took no position on the petition except to reiterate API's high burden and emphasize that granting the petition would be a "serious intrusion."

The court granted the medication petition. It found that Tonja lacked the capacity to give informed consent, that the court visitor could not locate an advance health care directive for Tonja, that medication was in Tonja's best interest, and that there were no other reasonable and less restrictive alternatives to medication. The court concluded that "the benefits of these medications clearly outweigh the minimally anticipated risks[,]" and that "Dr. Swogger ha[d] articulated a plan of treatment that includes close monitoring" for side effects.

### 2. 90-day commitment and medication petitions

Several weeks later API petitioned for a 90-day commitment order[6] and for continued authorization to administer medication. A hearing was held on April 8 on both petitions. Dr. Swogger again testified. She stated that Tonja had improved and was able to communicate but did not make much sense. She testified that Tonja continued to

---

[6]     *See* AS 47.30.740-.745 (setting out 90-day commitment procedure).

exhibit "symptoms of a thought disorder," including hallucinations and minor delusions. She also testified that Tonja still needed prompting to take care of her basic needs and that she was "not in any way able to procure her own food." She reported that Tonja's parents still wanted her to return home but wanted her to be more stable before she came home. She opined that returning Tonja to her family was "the strongest discharge plan" for her.

Dr. Swogger explained that Tonja's current treatment plan was to transition Tonja from oral medication to long-lasting injectable medication. Dr. Swogger testified that outpatient facilities or assisted living facilities were not viable alternatives because they were not able to involuntarily administer the injectable medication that Tonja needed and could not prevent Tonja from leaving.

The superior court granted the petition for a 90-day commitment. Based on Tonja's continued hallucinations and delusions and her inability to meet her needs, the court concluded that she remained gravely disabled as a result of her mental illness.

The master then considered the medication petition. The same court visitor testified. She reported that Tonja was "oriented in all spheres," but that she still struggled to identify her exact location, continued to be confused and disorganized, denied having a mental illness or need for medication, and was still unable to articulate reasonable objections to medication or identify any concerning side effects. The court visitor concluded Tonja still did not have capacity to give consent nor the ability to engage rationally in treatment. The visitor also testified that she again attempted to contact Tonja's father and was again unsuccessful, but this time the court visitor informed the court that Tonja "does not have an advance health care directive."

Dr. Swogger was called to testify about Tonja's need for medication. She agreed with the court visitor's testimony and added that Tonja's next treatment step was to transition her from daily pills to one injection every 14 days. She testified that Tonja

would benefit from continued medications and that Tonja had not experienced any side effects so far. She explained that Tonja would be unable to benefit from other therapies without further medication and that she "would go back to the way that she presented" without medication. She acknowledged that Tonja was at risk for weight gain and diabetes as a result of the medication but detailed measures API would take to counteract those side effects.

The court granted the petition authorizing continued administration of medication for the 90-day period. It found that Tonja did not have the capacity to give informed consent.

### 3. Appeal

Tonja appeals both her 90-day commitment and the administration of psychotropic medication. She argues that the superior court erred by finding that commitment to API was the least restrictive means for treating her. She also argues that the court visitor's report was cursory and it was error for the superior court to rely on it when ordering the administration of medication. She acknowledges that because she did not object to the visitor's report in superior court, she must show that this reliance was plain error. And she argues that the superior court failed to make specific findings that medication was in her best interests.

## III. STANDARD OF REVIEW

"We review the superior court's factual findings in involuntary commitment or medication proceedings for clear error and reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[7] Whether "findings meet the statutory requirements for involuntary commitment or medication is a question of law

---

[7] *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

to which we apply our independent judgment."[8]

"We review issues raised for the first time on appeal for plain error."[9] "A plain error involves an 'obvious mistake' that is 'obviously prejudicial.' "[10]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Finding That Commitment To API Was The Least Restrictive Alternative.

Tonja argues that the court erred by finding that commitment was the least restrictive alternative "because assisted living facilities were available to treat Tonja's mental health." The civil commitment statutes are guided in part by the principle "that persons be treated in the least restrictive alternative environment consistent with their treatment needs."[11] But "[a] proposed alternative 'must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action.' "[12] The superior court found in this case that "[a]ssisted living facilit[ies] would not be able to provide security of locked doors to prevent [Tonja] from eloping. They are also not geared to administering injectable medication with a noncompliant person." Dr. Swogger further testified that assisted living facilities usually would not accept "clients who are not compliant with their medication" and such facilities were not capable of administering Tonja's medication.

---

[8] *Id.* at 923-24.

[9] *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019).

[10] *Id.* (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014)).

[11] AS 47.30.655 (describing "purpose and principles" of revision to civil commitment statutes).

[12] *Naomi B.*, 435 P.3d at 933 (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185 (Alaska 2009)).

Tonja challenges the superior court's reasoning because she had no history of eloping and did not need medication. But the court found that even though Tonja did not have a history of leaving treatment, her hallucinations and delusions might cause her to "wander[] off out the door," as the master had noted. And Dr. Swogger's uncontradicted testimony was that Tonja continued to need medication in order to improve.

The superior court did not err by finding that there was no less restrictive alternative to commitment at API.

**B.     The Superior Court's Reliance On The Court Visitor's Cursory Report Was Not Obviously Prejudicial.**

Tonja argues that the court visitor failed to adequately investigate whether she had previously refused psychotropic medication while competent. "When the state files its petition to authorize psychotropic medication, the law requires a 'visitor' to be appointed to assist the court when it considers the petition."[13] "One of the two core duties assigned to the visitor under AS 47.30.839(d) is to investigate, document, and report any prior statements — oral or written — that the patient might have made while competent that expressed wishes regarding medication."[14] The purpose of the visitor's report is to assist the court in making "an informed decision" on whether API has met its burden to "prove by clear and convincing evidence that . . . the patient never previously made a statement while competent that reliably expressed a desire to refuse

---

[13]     *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 243 (Alaska 2006); *see also* AS 47.30.839(d).

[14]     *Myers*, 138 P.3d at 253. The visitor's other responsibility is to report "the patient's responses to a capacity assessment instrument." AS 47.30.839(d)(1).

future treatment with psychotropic medication."[15] Tonja contends that it was plain error for the superior court to rely on the court visitor's cursory report.

The court visitor testified that she "attempted to contact" Tonja's father but was unsuccessful. At the first hearing the court visitor testified that Tonja "*does not appear* to have an advance[] health care directive," but at the second hearing the visitor testified that Tonja "*does not* have an advance health care directive." The court visitor did not explain how she determined there was no directive and was not questioned further about her investigation.

Alaska Statute 47.30.839(d) requires the court visitor "to assist the court in investigating" and documenting "any expressed wishes of the patient regarding medication . . . that may have been expressed in a [legal document], or . . . conversations with relatives and friends that are significant persons in the patient's life . . . when possible." While the visitor's testimony implies that she investigated and determined that Tonja "does not" have an advance health care directive, there is no evidence that the court visitor did anything beyond her two unsuccessful attempts to reach Tonja's father.[16]

We have explained that "the court visitor's report is no mere technical requirement";[17] rather, it "is an essential component of the statutory scheme."[18] "[I]n the absence of an emergency, there is no reason why the statutory protections should be

---

[15]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 382 (Alaska 2007), *overruled on other grounds by Naomi B.*, 435 P.3d 918.

[16]     AS 47.30.839(d)(2) (outlining court visitor's responsibility to investigate patient's wishes regarding medication). The touchstone for assessing a court visitor's report is whether it permits "the court [to] make an informed decision." *Wetherhorn*, 156 P.3d at 382.

[17]     *Wetherhorn*, 156 P.3d at 382.

[18]     *Id.*

neglected in the interests of speed."[19]  Accepting a court visitor's report based only on unsuccessful attempts to reach a single relative risks turning the report into a mere technical requirement.  To ensure that the report assists the court in making a decision, a visitor should provide evidence of the efforts taken.  Without this evidence, the court may struggle to make "an informed decision" whether API has met its burden to "prove by clear and convincing evidence that . . . the patient never previously made a statement while competent that reliably expressed a desire to refuse future treatment with psychotropic medication."[20]

Nonetheless the superior court did not plainly err in this case because the visitor's cursory report was not "obviously prejudicial."[21]  The visitor's testimony implies that she did investigate further before the second hearing and determined that Tonja "does not have an advance health care directive."  In addition to the visitor's two failed attempts to contact Tonja's father, Dr. Swogger testified that she had been in contact with the parents.  And given Tonja's inability to communicate, she was unable to provide the court visitor with information.[22]  In light of these circumstances, the superior court did not plainly err by accepting the court visitor's report.

### C.     The Superior Court Did Not Err By Finding That Medication Was In Tonja's Best Interests.

Tonja argues that the superior court erred by failing to make specific

---

[19]     *Id.* at 381.

[20]     *Id.* at 382.

[21]     *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019) (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014)).

[22]     Because Tonja had previously been committed to API six times, it is possible that API records would have contained any advance directives she had made, if she had made any.

findings about whether the use of psychotropic medication was in her best interest. "[C]ourts must make specific findings on relevant, contested mandatory *Myers* factors before ordering involuntary medication . . . ."[23] Among those factors is "information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment."[24] Tonja contends that the court failed to adequately evaluate the risk of side effects and did not make specific findings about alternatives.

But the superior court did hear and make findings about side effects. It found that the potential "side effects noted in the petition [for medication] have not been observed in [Tonja], who is . . . young and generally healthy." It based this finding on testimony from Dr. Swogger, who described the measures API takes to monitor and treat side effects and expressed an opinion that Tonja's risk for side effects was low in relation to the benefits of medication. The court also heard testimony that Tonja had a history of successful treatment with the requested medication, was currently improving on the medication, had no history of side effects, and was presently experiencing no side effects. The court reasonably credited that testimony.[25]

The superior court also properly considered and rejected alternative treatments. During the 30-day commitment hearing, Tonja raised no potential alternatives. Dr. Swogger testified that she was "not aware [of] any outpatient provider

---

[23] *In re Hospitalization of Lucy G.*, 448 P.3d 868, 879 (Alaska 2019). The *Myers* factors mirror the statutory factors for informed consent found in AS 47.30.837(d)(2). *See Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 252 (Alaska 2006).

[24] *Myers*, 138 P.3d at 252.

[25] "We grant 'especially great deference' when the [superior court's] 'findings require weighing the credibility of witnesses . . . .' " *In re Hospitalization of Danielle B.*, 453 P.3d 200, 202-03 (Alaska 2019) (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)).

or outpatient program that would take someone that has the level of need . . . that [Tonja] has right now." During the 90-day commitment hearing, Dr. Swogger was again asked about discharging Tonja to an outpatient treatment program, but she indicated that "no [suitable] program exists in the state of Alaska." Despite this testimony the only alternative that Tonja raised was the possibility of release to an assisted living facility. The court considered and rejected this alternative, finding that no "less restrictive available facilities" existed and that an assisted living facility would not adequately protect Tonja.[26]

## V.    CONCLUSION

We AFFIRM the superior court's involuntary commitment and medication orders.

---

[26]    Tonja also argues that the superior court erred in not making findings about alternative medications like mood stabilizers. She also did not raise this before the superior court, but even if she had, we would conclude there was no error. We have described the involuntary administration of any psychotropic drug as "highly intrusive." *Myers*, 138 P.3d at 241-42. We also observe that such medications may have more than one effect, including stabilizing mood. *See, e.g.*, Martha Sajatovic et al., *Risperidone in the treatment of bipolar mania*, 2 NEUROPSYCHIATRY DISEASE AND TREATMENT 127, 128 (2006); Konstantinos N. Fountaoulakis et al., *Report of three cases that received maintenance treatment with risperidone as a mood stabilizer*, 3 ANNALS OF GEN. HOSP. PSYCHIATRY no. 10, 2004, at 3.