NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of ) | ) Supreme Court No.: S-18392 |
| AIDEN R. ) | ) Superior Court No.: 3AN-22-00600 PR |
| ) | ) MEMORANDUM OPINION AND JUDGMENT* |
| ) | ) No. 1996 – November 8, 2023 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Julia Bedell, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Maria C. Smilde, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.    INTRODUCTION

Aiden R.[1] was involuntarily committed for 30 days after the superior court concluded he was mentally ill and gravely disabled. The court also granted a petition for involuntary administration of psychotropic medication. Aiden appeals the 30-day

---

\*        Entered under Alaska Appellate Rule 214.

[1]        We use a pseudonym to protect Aiden's privacy.

commitment order, arguing that the court erred by finding that he was gravely disabled. He also challenges the adequacy of the findings underlying the order for involuntary medication. For the reasons explained below, we affirm both orders.

## II. FACTS AND PROCEEDINGS

### A. Background

On March 8, 2022, Aiden was arrested on harassment charges and taken to jail. Although the court issued an order for his release two days later, Aiden remained in custody on a mental health hold.[2]

A counselor at the jail filed a petition for an order authorizing Aiden's involuntary hospitalization for evaluation,[3] which the superior court granted,[4] finding probable cause that Aiden was mentally ill and gravely disabled. Aiden was subsequently admitted to the Alaska Psychiatric Institute (API) for evaluation.

Two days after Aiden was admitted, API filed a petition for a 30-day commitment order asserting that he was likely to cause harm to others and was gravely disabled. The petition asserted Aiden was mentally ill and currently "below baseline," alleging this was Aiden's sixth admission to API; he had been diagnosed with schizoaffective disorder; and he was currently manic, irritable, hostile, sexually inappropriate, and assaultive. API also filed a petition for court approval of involuntary administration of psychotropic medication. The petition alleged Aiden refused to take

---

[2] AS 47.30.705 (authorizing peace officers who have probable cause to believe an individual is gravely disabled to take that individual into protective custody for emergency evaluation).

[3] AS 47.30.705(a) (permitting under certain circumstances mental health professionals and others who have "probable cause to believe that a person is gravely disabled" to submit application to have person examined in custody).

[4] AS 47.30.700(a) (providing procedures for involuntary hospitalization for evaluation, including requiring judge to find "probable cause to believe the respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others").

the medications and there was reason to believe Aiden was incapable of giving or withholding informed consent for the medications.

**B.** **Bifurcated Hearing On Petitions For 30-Day Commitment And Involuntary Medication**

A bifurcated hearing on the petitions was held before a superior court master.

### 1. 30-day commitment hearing

At the commitment hearing the parties stipulated to the expert qualifications of Aiden's primary treating psychiatrist. The psychiatrist testified this was Aiden's sixth admission to API in the last six months.

The psychiatrist opined that Aiden was gravely disabled because of his deteriorated condition and he was exhibiting abnormal and severe mental, physical, and emotional distress. He expected Aiden to continue to deteriorate without treatment and asserted Aiden needed to be restabilized on medication. He diagnosed Aiden with schizoaffective disorder and explained that in his current manic state Aiden was hostile, insulting, talkative, high energy, difficult to interrupt, off tangent, and sexually preoccupied.

Based on a review of API records, the psychiatrist explained Aiden had been below his baseline level of functioning "probably since October." He explained Aiden was capable of independent living when at his baseline, citing the fact that Aiden had not been hospitalized for several years prior to his recent string of admissions since October 2021. He testified to his belief that Aiden could not currently live independently outside of a hospital setting, explaining that Aiden had "been engaging in intrusive or disruptive acts in the community . . . apparently like many he's exhibited here. I don't think that's going to change and it's just going to result in another cycle of arrest and rehospitalization." When asked if Aiden could live independently, the psychiatrist testified that he did not think Aiden would "be able to navigate. He's

engaging in hypersexual behavior that's gotten [him] in trouble in the community as well. So I don't think he would be out very long."

Aiden constantly interrupted throughout the psychiatrist's testimony, despite frequent reminders from the court and his attorney to wait until it was his turn to talk. Most of Aiden's interruptions throughout the hearing were tangents on topics such as oral hygiene, DJing, music festivals, and snowboarding. During a few of the interruptions Aiden expressed his desire to smoke marijuana.

When Aiden had the opportunity to testify, he explained he did not want to be at API because the nurses are not educated in "natural science or physical therapy," and did not let him hug and kiss them. When asked if he could be safe outside of the hospital, Aiden said he was trying to get into avalanche rescue: "So to actually improve the thought of being safe and get my mouth-to-mouth knowledge re-upped and stuff like that, as I used to be a trauma technician a long time ago."

The master concluded that Aiden was mentally ill and gravely disabled as a result, although the master did not conclude Aiden was likely to cause harm to himself or others. The master also determined there was no less restrictive alternative than commitment at API. The master then granted the petition committing him to API for up to 30 days.

### 2. Involuntary medication hearing

The involuntary medication hearing immediately followed. There were two witnesses: the court visitor[5] and the psychiatrist.

The visitor testified she had spoken with Aiden for approximately 20 minutes earlier that day. The visitor explained Aiden was "not oriented in all spheres" and unable "to rationally engage in treatment." She explained that Aiden had

---

[5] *See* AS 47.30.839(d) (providing that superior court shall appoint independent court visitor to assist in investigating capacity of patient subject to involuntary medication petition to give informed consent).

introduced himself as "the Boney Courthouse" and, when asked if he knew the date, Aiden said, "I haven't met her yet." The visitor concluded that Aiden did not appear competent to give informed consent, and she had been unsuccessful in contacting any of his relatives. She testified that she was not aware of Aiden having indicated any prior position on taking psychotropic medication while he had capacity to do so.

The psychiatrist explained his plan to medicate Aiden with haloperidol, an antipsychotic to which Aiden had responded well in October with no known adverse effects. He testified that possible side effects of haloperidol include muscle spasms, restlessness, and involuntary movements. The psychiatrist explained that staff are trained to watch for adverse symptoms and can administer diphenhydramine or lorazepam to treat side effects. He explained his plan to use olanzapine as an alternative medication option, which is approved for treatment of bipolar disorder and schizophrenia, in the event that Aiden did not tolerate haloperidol well.

The psychiatrist testified there was no treatment available for Aiden that was less intrusive than psychotropic medication. He explained that without medication Aiden's condition would continue to deteriorate and Aiden would continue to cycle through arrests and rehospitalizations. Based on the experience with Aiden's October admission he expected to see Aiden improve after a couple weeks of medication.

The psychiatrist testified that he observed slight improvement in Aiden's condition after he was given emergency medication the day before, but explained that if no additional medication was administered, Aiden's "prognosis is probably pretty poor at this point." When asked if Aiden's condition could improve through hospitalization alone without additional medication, the psychiatrist responded it was possible but he "d[idn't] see that happening at the moment." He acknowledged that when Aiden had most recently been hospitalized at API in February 2022, he was ultimately released after receiving only emergency medication.

At the close of the hearing, Aiden's attorney argued that Aiden did not need the proposed antipsychotic medication because it had been demonstrated in the past that emergency medication alone could sufficiently improve Aiden's condition.

### 3.     The superior court's orders

The superior court master made oral findings on the record that Aiden was mentally ill with schizoaffective disorder and gravely disabled.  The master explained Aiden was currently operating below his baseline level.  At baseline Aiden was able to stay out of API for years at a time and live independently.  The master cited Aiden's hypersexual, assaultive, and disruptive behaviors; his lack of insight into his mental illness; his inability to engage in discharge planning; and his recent cycles between jail and API.  The superior court adopted the master's recommendation and granted the petition for commitment.

Following the hearing for involuntary medication, the master found that Aiden did not have the capacity to provide informed consent for medication.  The master found that Aiden would deteriorate if he did not take the medication and noted that the psychiatrist did not expect any negative side effects.  The superior court adopted the master's recommendations and granted the petition for administration of involuntary medication.  Aiden objected to the master's recommendation for the order granting the petition, but the superior court reviewed the master's findings and conclusion de novo and rejected the objection.

## III.  STANDARD OF REVIEW

"We review the superior court's factual findings in involuntary commitment or medication proceedings for clear error and reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[6]  Whether

---

[6]     *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

factual findings "meet the statutory requirements for involuntary commitment or medication is a question of law to which we apply our independent judgment."[7] We review issues raised for the first time on appeal for plain error.[8]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err In Finding Aiden Was Gravely Disabled.

After a hearing a court may issue an order committing an individual "to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled."[9]  The relevant portion of the statute in effect at the time provided that a respondent is "gravely disabled" as a result of mental illness if they "will, if not treated, suffer or continue to suffer severe or abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently."[10]

---

[7]  *Id*. at 924.

[8]  *In re Hospitalization of Gabriel C*., 324 P.3d 835, 838 (Alaska 2014).

[9]  AS 47.30.735(c).  The standard for finding grave disability is high.  We have "characterized involuntary commitment for a mental illness as a 'massive curtailment of liberty' that demands due process of law."  *In re Naomi B*., 435 P.3d at 931 (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375-76 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918).

[10]  Former AS 47.30.915(9)(B) (2021).  The statutory definition of "gravely disabled" was amended in July 2022 with an effective date of October 2022, after the superior court issued its orders and the parties submitted opening briefs to this court.  *See* Ch. 41, § 29, SLA 2022.  The current amended definition, set forth in AS 47.30.915(11)(B), incorporates our holding in *Wetherhorn v. Alaska Psychiatric Institute*, 156 P.3d 371, 384 (Alaska 2007), into the statutory language.  This appeal considers the former definition.

In order to show distress and deterioration, "the State must establish a baseline level of the individual's 'ability to function independently' in order to demonstrate that there has been a 'substantial deterioration' of that ability."[11] A court must determine that the individual is gravely disabled at the time of the hearing, but "it must also take into account recent behavior and the potential for future suffering."[12]

Aiden argues there was insufficient evidence to demonstrate he had suffered a substantial deterioration from his baseline level and, therefore, the superior court erred in finding he was gravely disabled. Specifically, he contends the evidence failed to establish he had deteriorated from his baseline because there was no evidence that his baseline did not include delusional thinking or the other behaviors described by the psychiatrist as evidence of mania. In other words, Aiden argues that his baseline may in fact "be different from most people['s]."

Aiden's arguments are unpersuasive. The psychiatrist's uncontradicted testimony clearly established Aiden's accelerated deterioration from his former ability to safely live independently. The uncontradicted evidence showed that Aiden had previously lived independently without any hospitalizations for a period of years, but that he recently had been admitted to API five separate times over a period of approximately six months. The psychiatrist's testimony also established that treatment had improved Aiden's condition in the past. Specifically, the psychiatrist testified that Aiden's hostile and irritable behavior had substantially improved after his October hospitalization and medication, indicating that the severity of these behaviors was not his baseline level of functioning.

---

[11] *In re Hospitalization of Carl S.*, 510 P.3d 486, 494 (Alaska 2022) (quoting AS 47.30.915(9)(B) (2021)).

[12] *In re Hospitalization of Rabi R.*, 468 P.3d 721, 734 (Alaska 2020).

Aiden also argues his conduct at the commitment hearing, other reported behaviors, and recent series of hospitalizations over a relatively short period of time did not necessarily demonstrate a substantial deterioration from his baseline. Instead, Aiden asserts that the recent pattern of admissions to API reflects the realities of a transient lifestyle that "often puts him in contact with law enforcement, who then refer him to API because of his eccentric behavior." Aiden appears to consider each piece of evidence in isolation and then suggests that his behaviors are more akin to the kind of "socially eccentric" behavior that is sometimes misperceived as symptomatic of a mental disorder.[13]

These arguments are likewise not persuasive. It was proper for the court to consider each piece of evidence in the context of all the circumstances. The court found Aiden had a diagnosis of schizoaffective disorder; was currently manic, sexually inappropriate, assaultive, and irritable; lacked insight into his mental illness; was unable to formulate a discharge plan; and could not "navigate on his own in the community." The court also listed Aiden's recent incarceration, frequent admissions to API, and "rambling and tangential" interruptions that it observed during the hearing. The court found that the symptoms and behaviors described by the psychiatrist, and the behavior and tangential interruptions the court observed, were symptomatic of grave disability. The evidence taken as a whole, considering all the facts and circumstances, demonstrated that Aiden was gravely disabled and not merely engaged in "socially eccentric" behavior.

---

[13] We have previously explained that "there is a danger that the mentally ill may be confined merely because they are 'physically unattractive or socially eccentric' or otherwise exhibit 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.' " *Wetherhorn*, 156 P.3d at 378 (first quoting *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975); and then quoting *Addington v. Texas*, 441 U.S. 418, 426-27 (1979)).

The court did not err in determining there was clear and convincing evidence that Aiden was gravely disabled.

**B.  The Superior Court Did Not Err In Authorizing The Involuntary Administration Of Psychotropic Medication.**

To lawfully administer psychotropic medication in a non-crisis situation without obtaining a patient's consent, the State "must follow a two-step judicial process."[14]  First, the State must obtain an order for involuntary commitment.[15] Second, the State must file a second petition, in which it must prove by clear and convincing evidence (1) that the committed patient is currently unable to give or withhold informed consent regarding an appropriate course of treatment,[16] and (2) that the patient never previously made a statement while competent that reliably expressed a desire to refuse future treatment with psychotropic medication.[17]

If the court determines that an individual does not have capacity to give or withhold informed consent to medication, the court must then determine whether the medication is in the individual's best interests by clear and convincing evidence.[18]  The factors the court must consider in its best interests analysis are defined in

---

[14]     *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 242 (Alaska 2006).

[15]     *See* AS 47.30.700-.815 (defining procedures governing involuntary commitment).

[16]     *See* AS 47.30.836(3); AS 47.30.839(g).

[17]     *See* AS 47.30.839(g).

[18]     *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 250 (Alaska 2006) (concluding "an independent judicial best interests determination is constitutionally necessary").

AS 47.30.837(d)(2).[19]  The court must make specific findings "on relevant, contested mandatory *Myers* factors before ordering involuntary medication."[20]

Aiden argues the superior court failed to adequately consider whether administration of psychotropic medication was in his best interests and thus erred in issuing the order for involuntary administration of psychotropic medication. Specifically, Aiden argues the court failed to adequately consider the fourth and fifth *Myers* factors.[21]

With regard to the fourth *Myers* factor:  Aiden argues the court failed to consider the possible interactions that the proposed psychotropic medications might have with other medication and substances, including recreational drugs like marijuana.[22]  Aiden contends that the court's failure to consider possible interactions was error for two reasons:  (1) his interruptions during the commitment hearing, a few of which included mention of marijuana use, should have alerted the court to the need to make findings about possible interactions between the proposed medication and

---

[19]     Trial courts are obligated to consider these statutory factors under *Myers*, 138 P.3d at 252, and *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 180 (Alaska 2009).  In addition to the *Myers* factors, we have encouraged, but not required, trial courts to consider another set of best-interests principles from a Minnesota Supreme Court decision.  *See In re Hospitalization of Naomi B.*, 435 P.3d 918, 935 (Alaska 2019).

[20]     *In re Hospitalization of Lucy G.*, 448 P.3d 868, 879 (Alaska 2019) (clarifying rule articulated in *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 840 (Alaska 2014), that "the superior court must expressly make or incorporate specific findings on each of these best interests factors in a case where involuntary medication is requested.").

[21]     These factors are "an explanation of the interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol," and "information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment."  AS 47.30.837(d)(2)(D)-(E).

[22]     AS 47.30.837(d)(2)(D).

marijuana; and (2) given the highly invasive nature of the proposed medication,[23] failure to consider potential adverse interactions was obviously prejudicial.

Aiden did not raise these arguments below, so we review this issue for plain error.[24] "A plain error involves an 'obvious mistake' that is 'obviously prejudicial.' "[25] The obvious mistake must be such that it "creates a high likelihood that injustice has resulted."[26]

The superior court is required to make specific findings only "on relevant, contested mandatory *Myers* factors."[27] Here, the court's failure to make findings on the possible interactions between the psychotropic medication and marijuana or other recreational drugs does not constitute plain error. This factor was not relevant given the lack of any direct indication that Aiden was currently using such drugs.

The order did not allow for involuntary medication beyond the 30-day period of Aiden's involuntary hospitalization at API. There was no reasonable possibility that Aiden would have access to marijuana, alcohol, or any other recreational drugs while at API and on the proposed medication regime. In the event Aiden chose to continue the psychotropic medication voluntarily after his discharge from API (when he would theoretically have access to marijuana or other recreational drugs), he and his

---

[23] We have explained that psychotropic medications "are literally intended to alter the mind" and noted that "many states have equated the intrusiveness of psychotropic medication with the intrusiveness of electroconvulsive therapy and psychosurgery." *Myers*, 138 P.3d at 242.

[24] *In re Gabriel C.*, 324 P.3d at 838.

[25] *Id.* (first quoting *Adams v. State*, 261 P.3d 758, 773 (Alaska 2011); and then quoting *State, Dept. of Rev. v. Mitchell*, 930 P.2d 1284, 1288 (Alaska 1997)).

[26] *Sampson v. Alaska Airlines, Inc.*, 467 P.3d 1072, 1075 (Alaska 2020) (quoting *Baker v. Ryan Air, Inc.*, 345 P.3d 101, 109 (Alaska 2015)).

[27] *In re Hospitalization of Lucy G.*, 448 P.3d 868, 879 (Alaska 2019).

medical team would have been able to consider any possible interactions when formulating his discharge plan.

Aiden's brief, unsworn interruptions suggesting his desire to "blaze some weed" while snowboarding do not establish relevance of this factor. Under these circumstances, it is not surprising that Aiden is unable to articulate any prejudice, much less any obvious prejudice. For these reasons the court's failure to consider the possible interactions that the proposed psychotropic medications might have with other medications and substances, including recreational drugs like marijuana, was not plain error.

Aiden also argues the court erred when it failed to adequately consider the fifth *Myers* best interests factor by making "only cursory" findings as to alternative treatment plans, including nontreatment.[28] Aiden argues his discharge from hospitalization in February 2022 after receiving only emergency medication and without the involuntary administration of psychotropic medication contradicts the court's findings that Aiden was unlikely to "get better" without treatment. Aiden also argues that his quick deterioration upon release from hospitalization and involuntary psychotropic medication in October 2021 shows it is not clear that psychotropic medication — whether emergency or a 30-day course — would substantially improve his condition so as to prevent another cycle of arrest and hospitalization.

We disagree with this characterization of the record. The psychiatrist testified that when Aiden was administered only emergency medication in February 2022 and released from hospitalization, he was still "delusional and impaired at that time," indicating that emergency medication alone was insufficient to treat Aiden. Although Aiden argues that his rehospitalizations after October 2021 are evidence that psychotropic medication was ineffective and therefore another course of medication is

---

[28] AS 47.30.837(d)(2)(E).

not the least intrusive means of treating his mental illness, the psychiatrist explained that Aiden's condition did substantially improve after his 30-day commitment and medication in October, after which he "was not hostile at all."

The master made oral findings on the record that "[i]t's likely that [Aiden] would get worse and deteriorate if he didn't take medication. And it's likely he would improve if he does take the medication. And he has in fact improved in the past." The court made written findings adopting the master's recommendations that "[w]ithout treatment, it is unlikely that Respondent would get better and more likely he would remain in [his] current state and gradually deteriorate."

Our decision in *In re Hospitalization of Tonja P.* illustrates what is required to satisfy the fifth *Myers* factor.[29] Although the respondent in *Tonja P.* argued that the trial court "did not make specific findings about alternatives," we noted that the only alternative to medication the respondent expressly raised was release to an assisted living facility, which the expert witness psychiatrist had testified was not a viable option for the respondent due to her high level of need.[30] Under these circumstances we determined that the trial court had adequately considered and rejected alternatives to involuntary medication.[31]

Similarly, here the court made findings based on the psychiatrist's testimony that Aiden had responded well to the psychotropic medication in the past, the medication had previously improved Aiden's condition, and no negative side effects were expected. As in *Tonja P.*, the psychiatrist also testified that there were no viable alternatives capable of treating Aiden's condition. The court further made findings about the risks of nontreatment, finding that Aiden was unlikely to improve without the

---

[29]   524 P.3d 795 (Alaska 2023).

[30]   *Id.* at 802.

[31]   *Id*.

medication, making nontreatment a nonviable alternative.  In other words, the court considered and rejected the only alternative to treatment that Aiden expressly raised: nontreatment beyond the emergency medication he had already received.  The court thus did not err by authorizing the involuntary administration of psychotropic medication.

## V.     CONCLUSION

We AFFIRM the superior court's orders for involuntary commitment and administration of psychotropic medication.